572 So.2d 895 (1990)
Ernest Charles DOWNS, Appellant,
v.
STATE of Florida, Appellee.
No. 73988.
Supreme Court of Florida.
September 20, 1990.
Rehearing Denied January 3, 1991.
*896 Barbara M. Linthicum, Public Defender, and David A. Davis, Asst. Public Defender, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., and Richard E. Doran, Director, Crim. Appeal, Tallahassee, for appellee.
BARKETT, Justice.
In 1977, Ernest Charles Downs was convicted of first-degree murder and conspiracy to commit first-degree murder, and he was sentenced to death. This Court affirmed. Downs v. State, 386 So.2d 788 (Fla.), cert. denied, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 238 (1980). The Court then rejected Downs's collateral attack under Florida Rule of Criminal Procedure 3.850, Downs v. State, 453 So.2d 1102 (Fla. 1984), and his first petition for habeas corpus relief. Downs v. Wainwright, 476 So.2d 654 (Fla. 1985). Downs filed a second petition for habeas corpus relief based on a substantial change in the law caused by *897 Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). This Court granted relief and remanded for resentencing before a jury. Downs v. Dugger, 514 So.2d 1069 (Fla. 1987). Upon resentencing, the trial court followed the jury's recommendation and reimposed the death sentence. We affirm.[1]
Evidence presented by the state at the resentencing trial showed that Forrest Jerry Harris, Jr., a Jacksonville bank executive, was shot at a clandestine location in Jacksonville in April 1977. His body was not discovered until August 1977. Medical testimony revealed that Harris had been shot four times in the head and once in the midsection of the body with a.25-caliber gun. Any of the wounds could have been fatal.
The murder resulted from a conspiracy formed by Ron Garelick, who plotted to kill Harris so that he could collect proceeds from an insurance policy. The conspiracy involved at least six people at various times.[2] It started in 1976 with Garelick, John Barfield, Gerry Ralph Sapp, and Huey Austin Palmer. After those individuals failed to kill Harris, Barfield approached Downs on April 18, 1977, and offered him $5,000 to kill Harris. Downs agreed and enlisted the help of Larry Johnson. Barfield subsequently met with Downs and Johnson. Barfield told them that Harris expected a telephone call from a man named Green. On April 23, 1977, Johnson, identifying himself as Green, called Harris and arranged to meet him at the end of a dirt road. There is a dispute among the parties as to what happened next.
Johnson had testified for the state under a grant of full immunity in the guilt phase of Downs's first trial in 1977. Johnson was unavailable to testify in the resentencing proceeding in 1989, so the state read to the jury Johnson's prior sworn testimony. Johnson said that he did not want to kill Harris. Instead, he said, Downs insisted that he call Harris to lure him to meet at the dirt road. Downs drove Johnson to the end of the dirt road, dropped him off, gave him a .45-caliber machine gun, and went to pick up Harris. Downs returned with Harris shortly thereafter, Johnson said. When Harris started talking to Johnson, Downs pulled out a .25-caliber automatic pistol and fired at Harris, Johnson said. Downs stumbled and fell, righted himself, fired three more times, fell into the side of the truck, spun around, fired three times more, and stumbled to the ground. Johnson said Harris staggered and fell. Downs went over to Harris, put the gun to his head, and fired again. Johnson said he and Downs dragged Harris's body to the woods nearby, where they emptied his pockets. Then, Johnson testified, Downs wanted to shoot Harris again, so Downs loaded another shell into his pistol and fired a final shot into Harris's chest. The next morning, Johnson said, he and Downs went to Barfield's house. Downs showed Barfield Harris's driver's licence to prove that he killed Harris. Barfield gave Downs $500 at that time, and later made two more payments of $1,000 and $2,700, respectively.
Johnson's testimony was corroborated in part by various witnesses. Sapp testified that he heard Downs discuss the conspiracy with Barfield. He said Downs remarked that he was going to kill a man for $5,000; that Barfield distrusted Johnson; and that Downs agreed to show Barfield proof of the killing. Investigator Pat Miles and Detective Leroy Starling testified that in 1977 Barfield told them he solicited Downs to do the killing; that Downs agreed to kill Harris for $5,000; and that Downs presented Harris's driver's licence as proof of the murder.
*898 Downs's defense at the resentencing proceeding focused on establishing that he was not the triggerman and did not deserve the death penalty. Downs testified that Johnson drove him to the dirt road and dropped him off. Downs said he had changed his mind about participating in the murder, so he left the scene and went to the home of his grandmother, Bobbie Jo Michael. When Johnson found Downs at Michael's house later that night, Johnson was carrying Harris's driver's licence and money he took from the body. The next day, he and Johnson visited Barfield who paid Johnson $500 in partial payment for the murder.
Downs offered the testimony of various witnesses to support his theory of penalty defense that Johnson  not Downs  was the triggerman. Barfield testified that on the day after Harris died, Johnson presented Harris's driver's licence as proof of the killing, and Johnson admitted at that time that he was the one who killed Harris. However, Barfield conceded that in his own trial in 1978, he testified that he had no knowledge of Harris's murder. Downs's sister, Darlene Shafer, also testified that Johnson told her he had killed Harris.
Downs introduced character evidence to show that when he was a child, his father drank, beat his mother and the children, and then abandoned the family, leaving Downs, the eldest child, to help care for everyone his father left behind. At sixteen, Downs joined the army. The army discovered that he enlisted while under age, so it relegated Downs to kitchen-type duties. Downs then went AWOL, but eventually was honorably discharged. While AWOL, Downs returned to his family in Kansas, where he committed an attempted robbery and a robbery using a toy gun. He was put on probation, but he was sent to prison for violating probation because he left the foster home where he was living and returned to his mother and grandmother. In prison, Downs earned a high school graduate equivalency diploma and learned some construction skills. After his release in 1970, Downs went to the Jacksonville area where he married his first wife, had a daughter, and worked hard to provide for his family, even after divorcing his first wife. While in prison he helped his daughter to deal with her emotional problems, and he has remained friends with her mother. Several of Downs's former employers and business partners testified that they liked and trusted Downs, and that they would rehire him if he was released from prison. Richard Dugger, Secretary of the Department of Corrections, provided mitigating testimony, which the trial court sealed.
A forensic psychologist, Dr. Harry Krop, testified that Downs was insecure about his manhood and lacked self-respect. His emotional problem surfaced when, around the time of Harris's murder, Downs discovered photographs that revealed his second wife's infidelity and involvement with homosexual activity and pornography. Seeing those photographs "was basically demasculating ... bring[ing] forth a lot of his feelings of inadequacy, which he had a lot from childhood," Dr. Krop said. That caused Downs extreme stress, altering his personality and emotional state, and impairing his cognitive and emotional faculties at about the same time he joined the murder conspiracy. Based on his evaluation of Downs, interviews, and his review of testimony in this case, Dr. Krop concluded that Downs had strong potential for rehabilitation. However, Dr. Krop also concluded that Downs was not suffering from extreme mental or emotional disturbance at the time of the murder, and that he did have the capacity to appreciate the criminality of his conduct.
After hearing all the evidence, the jury voted eight to four to recommend the death sentence. The trial court found three aggravating circumstances: (1) Downs had a prior conviction for a felony involving the use or threat of use of violence; (2) the murder was committed for pecuniary gain; and (3) the murder was cold, calculated, and premeditated.[3] As to mitigation, the *899 trial court concluded that it could "not find mitigating factors to offset or overcome the aggravating circumstances in this case."
Downs raises numerous claims that he contends warrant reversal. First we address those claims that relate to the evidence presented or barred in the resentencing proceeding.
Downs argues that the trial court erroneously excluded a portion of the prior sworn testimony of his grandmother, Bobbie Jo Michael, whose testimony was perpetuated in a deposition in 1982, shortly before she died of cancer. In connection with Downs's then-pending claim for post-conviction relief on the ground of ineffective assistance of counsel, Michael testified that Downs was with her when the murder occurred. Downs claims that Michael's testimony was relevant, admissible evidence in the 1989 resentencing proceeding because it would have been valid mitigation in support of a life sentence by showing that Downs was not the triggerman. Downs argues that the testimony also had relevance to corroborate the testimony of Downs and others who said Johnson was the triggerman, and to impeach Johnson's testimony. The trial court barred the evidence on the ground that it was relevant only to the issue of guilt and not to the issue of penalty.
A defendant has the right in the penalty phase of a capital trial to present any evidence that is relevant to, among other things, the nature and circumstances of the offense. E.g., Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). Evidence that Downs was not the triggerman certainly was relevant to the circumstances of his participation in the crime, and, if true, it would have been valid mitigation. See § 921.141(6)(d), Fla. Stat. (1975) (minor participation in capital murder committed by another is statutory mitigating circumstance); cf. Zerquera v. State, 549 So.2d 189 (Fla. 1989) (trial court in guilt phase erred by suppressing evidence that could have cast doubt on state's allegation that defendant was the triggerman). Likewise, proof that Downs was not the triggerman would have been valid mitigation in light of the fact that his codefendants got lesser sentences or were not prosecuted at all. Campbell v. State, 571 So.2d 415, 419 n. 4 (Fla. 1990) ("Valid nonstatutory mitigating circumstances include ... 4) Disparate treatment of an equally culpable codefendant"); cf. Slater v. State, 316 So.2d 539 (Fla. 1975) (sentence of death was disproportional punishment when "triggerman" codefendant got life sentence).
In this case the evidence presented to support Downs's assertion that he was not the triggerman is inextricably intertwined with evidence pertaining to the issue of guilt.[4] We do not find that fact sufficient to bar the relevant evidence. Michael's testimony should have been admitted.
However, even though the trial court erred, we find the error to have been harmless. Downs succeeded in presenting his theory of penalty defense, and he supported it with various witnesses whose testimony contradicted Johnson's version of the killing in a manner not inconsistent with Michael's perpetuated testimony. We find in the record overwhelming proof to render the error of excluding the grandmother's cumulative testimony harmless beyond a reasonable doubt in this case. *900 See, e.g., State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
In a somewhat analogous claim, Downs argues that the court committed fundamental error when, without objection, it admitted the prior sworn testimony of Larry Johnson, who had testified in the guilt phase of the 1977 trial. The focus of the allegation is that Downs had a different motive for cross-examining Johnson in the guilt phase in 1977 than he had in cross-examining Johnson in the 1989 penalty phase. Downs claims that his motive in the guilt phase was to secure an acquittal, whereas his motive in 1989 was to contest Johnson's assertion that Downs was the triggerman. Because the motives were different, Downs claims, it was fundamental error to admit the former testimony.
Although Downs may have had a different motive for cross-examining Johnson in the 1977 guilt phase, the issue here is whether, absent contemporaneous objection, the trial court committed fundamental error when it allowed the jury to hear Johnson's testimony. Fundamental error must rise to the level of a denial of due process where "the interests of justice present a compelling demand for its application." Ray v. State, 403 So.2d 956, 960 (Fla. 1981). In this case, Downs introduced evidence to support his own theory of penalty defense and to impeach Johnson's account of the murder. The trial court did not commit fundamental error under these facts.
Next, Downs argues that the trial court erred in excluding several specific mitigating facts from the jury's consideration. We find only one point worthy of discussion. Richard Brown, the attorney who represented Downs in 1977, testified before the jury that he had never seen Downs show signs of violence or brutality during their time together. After Brown testified, the state objected to Brown's testimony as irrelevant, and the trial court sustained the objection. We agree with Downs that the trial court erred by sustaining the objection. Brown's testimony was admissible because it was relevant to "`any aspect of the defendant's character.'" Skipper, 476 U.S. at 4, 106 S.Ct. at 1671 (quoting Eddings, 455 U.S. at 110, 102 S.Ct. at 874). Nonetheless, we find the error harmless beyond a reasonable doubt under the facts of this case.
In his final issue dealing with the introduction of evidence, Downs argues that the court should not have quashed his subpoena to compel State Attorney Ed Austin to testify about the deals made with Downs's alleged coconspirators, particularly Johnson. Downs asserts that in 1977, the state had to administer four polygraph tests to Johnson before it was satisfied that Johnson was telling the truth. Since the state's case rested primarily on Johnson's testimony, Downs argues, he should have been allowed to compel Austin to testify "to attack the State's credibility."
We find no merit in this claim because the "state's credibility" was not in issue. Johnson's credibility certainly was in issue, but Downs has failed to show how Austin's testimony would have been relevant to attack Johnson's credibility. Austin's personal opinion about Johnson's credibility was not relevant to these proceedings. Thus, the trial court did not abuse its discretion in quashing the subpoena.
We next address Downs's claims concerning the trial court's instructions before and during jury deliberations. First, we reject the claim that the jurors should have been instructed to consider any lingering doubt they may have had about Downs being the triggerman. Cf. Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (plurality opinion) (no need for penalty phase instruction to consider lingering doubt of guilt); King v. State, 514 So.2d 354, 358 (Fla. 1987) (same), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (1988). Downs's next claim focuses on a question asked by the jury during deliberations. The jury asked: "Would the life sentence with no chance of parole for 25 years begin right now, or would the 11 years he's already spent in prison be subtracted from the 25 years?" The trial court consulted with both counsel and, over defense counsel's objection, it *901 instructed the jury that Downs "would receive credit for time served on this charge." Downs argues that the trial court's answer improperly "invited" the jury to assess future dangerousness, thereby adding a nonstatutory aggravating circumstance to the jury instruction. The state argues that Downs created the issue by arguing to the jury that a life sentence would "protect[] society from him for the next 25 years." Under the facts presented, we find that the trial court did not abuse its discretion.[5]
Downs also takes issue with the lack of discussion of mitigation in the sentencing order.[6] We acknowledge that Downs did present substantial valid non-statutory mitigating evidence. Nonetheless, after reviewing the record and the sentencing order in its entirety, we are satisfied that the trial court properly considered that evidence and conducted the appropriate balance, concluding that it could "not find mitigating factors to offset or overcome the aggravating circumstances in this case."[7]
Finally we reject the claim that the death penalty is disproportional punishment. First, there is substantial competent evidence in the record to support the trial court's conclusion that Downs was the triggerman in a cold-blooded contract murder. This Court has affirmed the death sentence in similar cases where the trial court followed the jury's recommendation of death. See Ventura v. State, 560 So.2d 217 (Fla. 1990); Kelley v. State, 486 So.2d 578 (Fla.), cert. denied, 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986); Hoffman v. State, 474 So.2d 1178 (Fla. 1985). Second, we are satisfied that the penalty is not disproportional when compared to the treatment of coconspirator Johnson. Disparate treatment of a codefendant renders punishment disproportional if the codefendant is equally culpable. E.g., Slater v. State, 316 So.2d 539 (Fla. 1975) (reducing defendant's death sentence to life imprisonment because "triggerman" codefendant was sentenced to life in a plea bargain). In this case, however, evidence in the record supports the trial court's conclusion that Downs was the triggerman and thus was more culpable than Johnson.
Having found no reversible error, and having considered any possible cumulative effect of the harmless errors found above, we affirm the sentence of death.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, EHRLICH, GRIMES and KOGAN, JJ., concur.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] See Downs v. Dugger, 514 So.2d 1069, 1070 nn. 1-2 (Fla. 1987). Ron Garelick died when his private plane crashed two days after Harris's body was discovered. Larry Johnson and Huey Austin Palmer testified in the first trial under grants of full immunity or had all charges dropped. Gerry Ralph Sapp accepted a five-year plea bargain for his participation. John Barfield was convicted of first-degree murder and was sentenced to death, but that sentence was later reduced to life imprisonment. Barfield v. State, 402 So.2d 377 (Fla. 1981).
[3] The trial court merged the second and third aggravating circumstances, reasoning that each would have to be established in every case of contract murder.
[4] There is no basis in this record to believe, as the state claims, that the issue to which Michael testified in 1982 was limited merely to Downs's guilt. Rather, Downs solicited Michael's testimony in 1982 regarding counsel's failure to adequately challenge the proof of guilt and to mitigate the severity of Downs's culpability in the penalty phase. See Downs v. State, 453 So.2d 1102, 1103 (Fla. 1984) (motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 included Downs's claim of ineffective assistance of counsel in both guilt and penalty phases of the original trial). Even if the primary focus of Michael's testimony at the rule 3.850 hearing had been guilt, the fact at issue here would have been valid mitigating evidence, which Downs was constitutionally entitled to present.
[5] In a related claim, Downs argues that the trial court erred by not requiring his presence when the trial court, in the presence of defense counsel and the prosecutor, addressed a question the jury asked during deliberations. For the reasons stated in Meek v. State, 487 So.2d 1058 (Fla. 1986), we find no merit in this claim.
[6] In a claim related to the sentencing order, Downs argues that the trial court erred by applying the cold, calculated, and premeditated aggravating circumstance in violation of the constitutional prohibition against ex post facto laws. Once before this Court found no ex post facto violation on this same question. Combs v. State, 403 So.2d 418 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2258, 72 L.Ed.2d 862 (1982). Downs invites us to revisit that issue here in light of subsequent interpretations of the law. See, e.g., Miller v. Florida, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). Downs also argues that the same error violated article X, section 9 of the Florida Constitution. However, we find no need to consider these claims under the facts in this record. The trial court's sentencing order combined the cold, calculated, and premeditated aggravating circumstance with the pecuniary gain aggravating circumstance. See supra at 898 n. 3. Thus, even if we were to hold invalid the cold, calculated, and premeditated aggravating circumstance, the error would have made no difference because Downs did not contest the pecuniary gain aggravating circumstance.
[7] We emphasize, however, that every capital sentencing court is obligated to "expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature." Campbell v. State, 571 So.2d 415, 419 (Fla. 1990).