801 So.2d 906 (2001)
Ernest Charles DOWNS, Petitioner,
v.
Michael W. MOORE, Secretary, Florida Department of Corrections, Respondent.
No. SC00-2186.
Supreme Court of Florida.
September 26, 2001.
Rehearing Denied December 3, 2001.
*908 Michael P. Reiter, Capital Collateral CounselNorthern Region, John P. Abatecola, Chief Assistant CCRCNorthern, and Harry Brody, Assistant CCRC Northern, Office of the Capital Collateral CounselNorthern Region, Tallahassee, FL, for Petitioner.
Robert A. Butterworth, Attorney General, and Stephen R. White, Assistant Attorney General, Tallahassee, FL, for Respondent.
PER CURIAM.
Ernest Charles Downs petitions this Court for writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(9), Fla. Const. For reasons expressed below, we deny the petition.
Downs was convicted of first-degree murder and sentenced to death for his part in the 1977 murder of Forrest Jerry Harris, Jr. Although affirmed on appeal, Downs' sentence subsequently was vacated and his case was remanded for a new sentencing proceeding. On appeal following resentencing, during which Downs again was sentenced to death, this Court affirmed the sentence. See Downs v. State, 572 So.2d 895 (Fla.1990). The facts in this case are set forth in greater detail in that opinion.
The procedural history of this case is summarized in our recent opinion affirming the trial court's denial of Downs' latest motion for postconviction relief filed pursuant to rule 3.850 of the Florida Rules of Criminal Procedure. See Downs v. State, 740 So.2d 506 (Fla.1999). Downs *909 now petitions this Court for writ of habeas corpus, alleging twelve claims of ineffective assistance of appellate counsel.[1] We find the claims to be without merit and, therefore, deny the writ.[2]

ANALYSIS
"Habeas petitions are the proper vehicle to advance claims of ineffective assistance of appellate counsel." Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000). The requirements for establishing a claim based on ineffective assistance of appellate counsel parallel the standards announced in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Wilson v. Wainwright, 474 So.2d 1162, 1163 (Fla.1985). Thus, in order to prevail, the "[p]etitioner must show 1) specific errors or omissions which show that appellate counsel's performance deviated from the norm or fell outside the range of professionally acceptable performance and 2) the deficiency of that performance compromised *910 the appellate process to such a degree as to undermine confidence in the fairness and correctness of the appellate result." Id.; see also Rutherford, 774 So.2d at 643; Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000); Groover v. Singletary, 656 So.2d 424, 425 (Fla.1995); Suarez v. Dugger, 527 So.2d 190 (Fla.1988).
However, appellate counsel cannot be considered ineffective under this standard for failing to raise issues that are procedurally barred because they were not properly raised during the trial court proceedings and do not present a question of fundamental error. See Rutherford, 774 So.2d at 643; Robinson v. Moore, 773 So.2d 1, 4 (Fla.2000); Roberts v. State, 568 So.2d 1255 (Fla.1990) (holding that appellate counsel's failure to raise a claim which was not preserved for review and which does not present a question of fundamental error does not constitute ineffective performance warranting relief). The same is true for claims without merit; appellate counsel cannot be deemed ineffective for failing to raise non-meritorious claims on appeal. See Rutherford, 774 So.2d at 643.
With these principles in mind, we now turn to Downs' ineffective assistance of appellate counsel claims.

Comment on Right to Remain Silent
In his first claim, Downs argues that his Fifth Amendment rights were violated when the prosecutor elicited testimony from Downs about his post-arrest silence. During resentencing, Downs testified that while he had been a part of the conspiracy to kill Harris, he did not kill Harris and was not present at the time of the murder. On cross examination, the prosecutor asked Downs if at the time of his arrest or upon his return to Jacksonville, he told the Jacksonville police officers any of the information he testified to on direct examination. Downs replied that he did not. Downs contends that this question violated his Fifth Amendment right to remain silent. He further contends that the prosecutor compounded this error during closing argument when he commented on the fact that after his arrest, Downs failed to tell the police anything about the circumstances of the offense.[3] Downs argues that his appellate counsel rendered ineffective assistance by failing to raise this claim on appeal.
The record reveals, however, that trial counsel did not object to the prosecutor's questions to Downs during cross-examination or to the prosecutor's comment during closing argument. As a result, any error in the State's questioning of Downs was not preserved for appellate review. Because appellate counsel cannot be deemed ineffective for failing to raise an unpreserved claim, see Rutherford, 774 So.2d at 643, this claim is without merit unless petitioner can demonstrate fundamental error. See Rutherford, 774 So.2d at 646; Robinson, 773 So.2d at 4. "Fundamental error is defined as the type of error which `reaches down into the validity of the trial itself to the extent that a verdict *911 of guilty could not have been obtained without the assistance of the alleged error.'" McDonald v. State, 743 So.2d 501, 505 (Fla.1999) (quoting Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla.1998)).
Here, however, the underlying claim does not appear to constitute error, much less fundamental error. Downs argues that the prosecutor's question during cross-examination and his comment during closing argument were improper comments on Downs' post-arrest silence. The U.S. Supreme Court has held that the Due Process Clause of the Fourteenth Amendment prohibits the use by the prosecution of a criminal defendant's post-arrest and post-Miranda[4] silence for impeachment purposes. See Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The Court reasoned that "[s]ilence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights." Id. at 617, 96 S.Ct. 2240. Accordingly, the Court found that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id. at 618, 96 S.Ct. 2240; accord State v. Hoggins, 718 So.2d 761 (Fla.1998) (holding that the Florida Constitution prohibits use of defendant's postarrest, post-Miranda silence as well as post-arrest, pre-Miranda silence).[5]
However, this Court has held that Doyle's prohibition does not apply where the defendant does not invoke his Fifth Amendment privilege against self-incrimination. See Valle v. State, 474 So.2d 796 (Fla.1985), vacated on other grounds, 476 U.S. 1102, 106 S.Ct. 1943, 90 L.Ed.2d 353 (1986). In Valle, this Court found that where a defendant refuses to answer one question out of many during a lengthy interrogation following the defendant's waiver of his constitutional rights, the State is not precluded from subsequently admitting evidence of the defendant's silence at trial. See id. at 801 (citing Ragland v. State, 358 So.2d 100 (Fla. 3d DCA 1978)).
In the instant case, the State's question obviously was intended to impeach Downs and demonstrate to the jury that Downs' version of events was concocted sometime after his arrest. This questioning would be inappropriate under Doyle if it referred to Downs' post-arrest, post-Miranda silence and Downs had not waived his constitutional rights. However, the record in the instant case reveals that Downs waived his constitutional rights at the time of his arrest because he agreed to talk with the arresting officers. During the resentencing proceeding, Detective Jim Spaulding, one of the officers who arrested Downs in Alabama, testified that he and another officer, David Starling, read Downs his constitutional rights on the trip from Alabama to Florida, during which Downs waived his rights and agreed to talk with police upon their return to Jacksonville.[6] Based upon this record, we *912 find that Downs waived his constitutional rights and expressed a desire to talk to the police. Accordingly, we find no error with regard to the State's question or comment. Appellate counsel's failure to raise this issue on appeal, therefore, does not constitute deficient performance under Strickland.

Proposed Jury Instructions
In claims two, three and five, Downs argues his appellate counsel was ineffective in failing to challenge the trial court's denial of several proposed jury instructions on mitigating circumstances. He contends that the trial court should have instructed the jury (1) that it could consider mercy during its deliberations (claim two); (2) that it could consider the immunity and leniency received by the codefendants (claim three);[7] (3) that it could consider doubt about whether Downs was the triggerman (claim three);[8] and (4) that it could consider the law pertaining to principals of a crime (claim five).[9] Although the trial court gave the standard jury instruction on mitigating circumstances, Downs argues that the standard jury instructions do not adequately instruct the jury as to how to consider the mitigating factors argued by the defense.
We find each of these claims to be without merit. The trial court gave the standard jury instructions in this case, which included the approved "catch-all" provision for mitigating circumstances. The instruction stated:
Among the mitigating circumstances you may consider if established by the evidence are:

*913 . . . .
4. Any other aspects of the defendant's character or record, and any other circumstances of the offense.
This Court has held that the "catch-all" standard jury instruction on nonstatutory mitigation when coupled with counsel's right to argue mitigation is sufficient to advise the jury on nonstatutory mitigating circumstances. See Booker v. State, 773 So.2d 1079, 1091 (Fla.2000); Elledge v. State, 706 So.2d 1340, 1346 (Fla.1997). Thus, appellate counsel was not ineffective for failing to argue that the trial court erred in rejecting Downs' proposed instructions. See Correll v. Dugger, 558 So.2d 422, 425 (Fla.1990) (holding appellate counsel not ineffective for failing to argue on appeal that trial court had failed to give a specific penalty phase instruction that the jury could consider mercy during the course of its deliberations).
Of course, most of the mitigating factors upon which counsel sought specific instructions are covered by the standard "catchall" instruction. We note that during closing arguments, defense counsel argued that Johnson was the triggerman, that the other codefendants received lighter sentences despite their involvement in the conspiracy, and that based on the circumstances in this case and the mitigating factors, the jury should show mercy and recommend a life sentence. Thus while the jury was not specifically instructed by the court that it may consider these factors, defense counsel certainly argued that it should. Under these circumstances, Downs has failed to demonstrate that counsel's failure to challenge the denial of requested instructions on appeal constituted deficient performance which prejudiced him.

Motion to Disqualify State Attorney's Office and Trial Court
In claims seven and eleven in the petition, Downs argues that appellate counsel was ineffective in failing to challenge the trial court's denial of his motions to disqualify the State Attorney's Office for destroying relevant records and the trial judge based on her knowledge or awareness of inadmissible evidence. Both motions concerned the same evidencenamely the results of four polygraph tests given to Larry Johnson, one of the co-conspirators in this case and the person who testified against Downs as to the circumstances surrounding the murder. We find both claims to be without merit.

A. Motion to Disqualify the State Attorney's Office
During the mid- to late 1980s, Downs filed a petition for a writ of mandamus in circuit court in Duval county to direct the State Attorney's Office to allow him to copy and inspect Johnson's polygraph test results. The circuit court dismissed the petition and the First District Court of Appeal reversed. See Downs v. Austin, 522 So.2d 931 (Fla. 1st DCA 1988). The district court held that the public records law did not exempt the polygraph test results from disclosure, and, therefore, Downs was entitled to them. In response to the writ of mandamus, Ed Austin, the State Attorney, stated that the polygraph results no longer existed as they had been destroyed by the Jacksonville Sheriff's Office at some point during the previous eleven years. During the resentencing proceeding, Downs filed a motion, pro se, to disqualify the State Attorney's Office. That motion alleged that the State had indicated in several proceedings in this case that a state witness (i.e., Johnson) had taken and passed a polygraph test; that the State destroyed the results of this test and was not able to disclose them in a post-trial public records request; that the State Attorney would be called as a witness during the resentencing proceeding; *914 that the State Attorney's Office was a defendant in a civil suit filed by Downs; and that as a result of these grounds, the State Attorney was prejudiced against Downs. The trial court denied the motion, ruling that Downs had not made a sufficient showing to disqualify the State Attorney's Office.
To disqualify the State Attorney's Office, a defendant must show substantial misconduct or "actual prejudice." Farina v. State, 679 So.2d 1151 (Fla.1996) (holding actual prejudice not shown where state attorney improperly asked clerk's office to assign case to particular division), receded from on other grounds by Franqui v. State, 699 So.2d 1312 (Fla.1997); State v. Clausell, 474 So.2d 1189, 1191 (Fla.1985). Actual prejudice is "something more than the mere appearance of impropriety." Kearse v. State, 770 So.2d 1119, 1129 (Fla. 2000) (quoting Meggs v. McClure, 538 So.2d 518, 519 (Fla. 1st DCA 1989)).
Under these rules, none of the allegations in Downs' motion indicated actual prejudice. The fact that he initiated a civil suit against the State Attorney's Office to obtain copies of the polygraph test results and that the documents no longer existed does not, without more, indicate that the State was biased or prejudiced against him. Thus, it does not appear that the trial court erred in denying the motion to disqualify the State Attorney's Office. As a result, Downs' appellate counsel cannot be deemed ineffective for failing to pursue this claim on appeal. See Rutherford, 774 So.2d at 643 (holding that appellate counsel cannot be deemed ineffective for failing to raise on appeal a nonmeritorious claim).

B. Motion to Disqualify Trial Judge
For similar reasons, we also find claim eleven to be without merit. The record indicates that in January 1989, Downs filed a pro se motion to disqualify Judge Dorothy Pate from presiding over the resentencing proceeding.[10] Downs attached to the motion two affidavits in support of his claim: one by Roberto Arias, his court-appointed attorney, and one by himself, filed on his own behalf. Arias stated in his affidavit that because the State presented evidence of Johnson's polygraph results (i.e., that he was telling the truth about not being the triggerman), the court was "in the untenable position of having to disregard evidence which it has already heard." Downs' affidavit stated the same and added a few other allegations namely, that the State had presented evidence of the polygraph results, that the State had his since destroyed those tests, that the court had refused Downs' request to take a polygraph test, and that the court had exhibited prejudice in its rulings and warnings to the defense. The affidavits were based, in part, on the fact that during the initial trial in 1978, the State made reference to the fact that Johnson had taken and passed polygraph tests. The trial court denied the motion on the ground it was legally insufficient.
In the instant habeas petition, Downs argues that appellate counsel was ineffective for failing to argue that the trial court had improperly denied his motion to disqualify the judge. However, we find this claim to be without merit because Downs' motion to disqualify failed to demonstrate any bias or prejudice.
*915 In Livingston v. State, 441 So.2d 1083 (Fla.1983), we set forth the requirements for a motion to disqualify a trial judge:
First, there must be a verified statement of the specific facts which indicate a bias or prejudice requiring disqualification. Second, the application must be timely made. Third, the judge with respect to whom the motion is made may only determine whether the motion is legally sufficient and is not allowed to pass on the truth of the allegations.
Id. at 1086; see also Fla. R. Jud. Admin. 2.160. To be legally sufficient, a motion to disqualify must demonstrate "some actual bias or prejudice so as to create a reasonable fear that a fair trial cannot be had." Dragovich v. State, 492 So.2d 350, 353 (Fla.1986); see also Thompson v. State, 759 So.2d 650 (Fla.2000) ("A motion to disqualify a judge `must be well-founded and contain facts germane to the judge's undue bias, prejudice, or sympathy.'") (quoting Rivera v. State, 717 So.2d 477, 480-81 (Fla.1998)). In determining whether the motion is legally sufficient, this Court looks to see "whether the facts alleged would place a reasonably prudent person in the fear of not receiving a fair and impartial trial." Correll v. State, 698 So.2d 522 (Fla.1997) (quoting Livingston, 441 So.2d at 1087).
Here, Judge Pate presided over the initial trial, the initial 3.850 proceedings and the resentencing proceedings. The fact that this judge may have learned that Johnson passed a polygraph test, without more, did not create a reasonable fear that a fair and impartial trial could not be had. See, e.g., Dragovich, 492 So.2d at 353 (holding that appellant's allegation that trial judge had a fixed opinion about appellant because judge presided over trial of appellant's codefendant did not establish actual bias or prejudice so as to create a reasonable fear that a fair trial could not be had). Downs has alleged no facts to show that the mere knowledge of Johnson's polygraph test results actually biased or prejudiced Judge Pate or otherwise caused her to disregard her obligations of impartiality and sentence Downs to death.
The remaining allegations in the motion also appear to be legally insufficient. First, the fact that the State Attorney's Office lost or destroyed the polygraph results does not indicate any bias on behalf of the judge. Second, the fact that the trial court during the resentencing proceedings denied Downs' request to take a polygraph is not a legally sufficient reason for disqualification. This Court has repeatedly held that an adverse ruling does not provide a legally sufficient basis for disqualification. See Thompson, 759 So.2d at 659 ("[T]he fact that a judge has ruled adversely to the party in the past does not constitute a legally sufficient ground for a motion to disqualify."); Correll, 698 So.2d at 525 ("However, an adverse ruling is not sufficient to establish bias or prejudice.").
Because Downs failed to present any facts indicative of actual bias or prejudice on the part of Judge Pate, his motion was legally insufficient.[11] As a result, this claim would have been rejected on appeal as being without merit. Appellate counsel cannot be faulted for failing to argue a nonmeritorious claim on appeal. See Rutherford, 774 So.2d at 643.

Admission of False Identification Cards
In claim nine, Downs claims that his appellate counsel rendered ineffective *916 assistance on appeal by failing to argue that the trial court erred in permitting the State to introduce a driver's license with Downs' picture but bearing a different name. He claims that such evidence constituted improper nonstatutory aggravation and prejudicial evidence of flight. We find this claim to be without merit.
As for Downs' assertion that appellate counsel should have challenged the admission of the fake license as improper evidence of flight, we find that trial counsel failed to preserve this specific argument for appellate review. Although trial counsel objected to the admission of the license, he did so on grounds that the license was not relevant to the resentencing proceedings. Trial counsel did not argue that the license was being improperly used to show flight. Thus, it does not appear from the record that Downs preserved this issue for appeal. Hence, appellate counsel cannot be deemed ineffective for failing to raise it on appeal. See Rutherford, 774 So.2d at 643.
Moreover, it does not appear from the record that the State attempted to use the false driver's license as nonstatutory aggravation or as evidence of flight. The record indicates that after the State's last witness testified, the State submitted into evidence the driver's license displaying Downs' picture but bearing his brother's name. The State argued that the license was relevant to show what Downs looked like in 1977, especially since Downs had made an issue of his appearance during that time. Indeed, Downs testified that in 1977 he had blond hair from working in the sun. He also introduced photographs allegedly taken in 1977, which he claimed depicted how he looked during that time. The trial court admitted the license over defense counsel's objection. The State did not argue that the license indicated evidence of flight. And the State did not refer to the driver's license during its closing argument or argue that it showed Downs' propensity to commit crimes. Accordingly, we find both arguments to be without merit. As a result, Downs has failed to demonstrate that appellate counsel's failure to raise either of these arguments on appeal constituted deficient performance sufficient for habeas relief.

Prosecutorial Comments
Finally, in claim ten of the petition, Downs argues that appellate counsel was ineffective for failing to argue on appeal that the State had improperly appealed to the jurors' sense of duty as citizens of the State of Florida in urging them to recommend a sentence of death. The record reveals that the State concluded its closing arguments with the following comment:
Ladies and gentlemen, this type of outrageous assault on citizens of our community by murderers such as Downs causes society to react, and the State of Florida demands the death penalty here, because there is a societythe State of Florida has been harmed by this criminal episode that this defendant committed back in April of 1977.
On behalf of the State of Florida, I would ask you and urge you to recommend death for Ernest Charles Downs.
Trial counsel did not object to this comment. Therefore, appellate counsel cannot be deemed ineffective for failing to raise an unpreserved issue on appeal. See Rutherford, 774 So.2d at 643.

CONCLUSION
In sum, we find that Downs has failed to establish that his appellate counsel was deficient under the standards set forth in Strickland and its progeny. Accordingly, we conclude that Downs is not entitled to relief and hereby deny the petition for writ of habeas corpus.
It is so ordered.
*917 SHAW, HARDING, and LEWIS, JJ., concur.
WELLS, C.J., concurs with an opinion, in which QUINCE, J., concurs.
ANSTEAD, J., specially concurs with an opinion, in which PARIENTE, J., concurs.
WELLS, C.J., concurring.
I concur in the majority's decision and write separately to discuss my concern about the application of the doctrine of fundamental error in capital habeas corpus analysis as set forth in Rutherford v. Moore, 774 So.2d 637 (Fla.2000). The use of the doctrine of fundamental error should not be a basis to provide for a broad re-review in these habeas cases.
Historically, this Court has repeatedly said that capital habeas corpus proceedings were not intended to be a second appeal of issues which could have been or were presented on direct appeal or in a rule 3.850 proceeding.[12]See Hildwin v. Dugger, 654 So.2d 107, 111 (Fla.1995); Hardwick v. Dugger, 648 So.2d 100, 105 (Fla.1994); Scott v. Dugger, 604 So.2d 465, 470 (Fla.1992); Breedlove v. Singletary, 595 So.2d 8, 10 (Fla.1992); Medina v. Dugger, 586 So.2d 317, 318 (Fla.1991); Swafford v. Dugger, 569 So.2d 1264, 1266 (Fla. 1990); Roberts v. State, 568 So.2d 1255, 1261 (Fla.1990); Bolender v. Dugger, 564 So.2d 1057, 1059 (Fla.1990); Clark v. Dugger, 559 So.2d 192, 193 (Fla.1990); Porter v. Dugger, 559 So.2d 201, 203 (Fla.1990); Mills v. Dugger, 559 So.2d 578, 579 (Fla. 1990); Parker v. Dugger, 550 So.2d 459, 460 (Fla.1989); Suarez v. Dugger, 527 So.2d 190 (Fla.1988); White v. Dugger, 511 So.2d 554, 555 (Fla.1987); Blanco v. Wainwright, 507 So.2d 1377, 1384 (Fla.1987); see also Johnson v. Wainwright, 463 So.2d 207, 210 (Fla.1985) ("[W]e will not allow this habeas corpus proceeding to become a direct vehicle for belated appellate review."). This rule is based on the need for finality.
This Court has defined fundamental error as "an error that `reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.'" Rutherford, 774 So.2d at 648 (quoting Urbin v. State, 714 So.2d 411, 418 n. 8 (1998)) (emphasis added). I emphasize the words trial itself because that is when the error occurs. The justification for the fundamental error exception to the preservation rule is that the error is so serious that the trial judge should have sua sponte acted to correct it even though defense counsel failed to object. It logically follows then that a defendant's trial counsel who did not object to such an egregious error must be ineffective by definition under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as there can be a showing of both deficient performance and prejudice to the defendant. Thus, if a trial counsel in a rule 3.850 proceeding is not proven to be ineffective, then it must follow that appellate counsel cannot have been ineffective for not raising the same error as fundamental error on direct appeal.[13]
*918 The specific purported error claimed to be fundamental in this case is that trial counsel in the resentencing proceeding failed to object to questions which were posed to Downs during cross-examination and which elicited testimony of Downs' post-arrest silence.[14] However, Downs did not raise this issue before us during his 3.850 proceeding. See Downs v. State, 740 So.2d 506, 509 n. 4 (Fla.1999). If this purported error were so severe as to undermine "the validity of the trial itself," Downs could have raised it in the 3.850 proceedings attacking trial counsel's alleged ineffectiveness. Downs declined to do so. Accordingly, I would find this issue to be procedurally barred and would not extensively address the merits as the majority does. See, e.g., Parker, 550 So.2d at 460 ("[H]abeas corpus petitions are not to be used for additional appeals on questions which could have been ... raised ... in a rule 3.850 motion....").
To expansively review trial records for fundamental error in these habeas proceedings in search of errors which should have been raised at trial conflicts with this Court's long-standing policy of not converting a capital habeas proceeding into a second appeal for issues which could have been encompassed within a 3.850 motion. This makes these habeas petitions effectively re-reviews of what has already been reviewed and rejected, which does not serve this process well.
QUINCE, J., concurs.
ANSTEAD, J., specially concurring.
I concur in the majority's conclusion denying Downs' petition for writ of habeas corpus including his claim relating to his request for jury instructions on mitigation. Despite my agreement that Downs has not demonstrated the incompetency of appellate counsel, I write separately to express my concerns with the adequacy of the "catch-all" provision of the jury instructions for mitigating evidence. I am particularly concerned as to whether that brief instruction provides sufficient guidance as to what nonstatutory mitigation the jury may properly consider during its deliberations.[15]
In Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), a majority of the Court in a fragmented opinion concluded that the capital sentencing schemes in Texas and Georgia were unconstitutional. See id. at 253, 92 S.Ct. 2726 (Douglas, J., concurring); id. at 291-300, 92 S.Ct. 2726 (Brennan, J., concurring); id. at 310, 92 S.Ct. 2726 (Stewart, J., concurring); id. at 311-14, 92 S.Ct. 2726 (White, J., concurring); id. at 362-70, 92 S.Ct. 2726 (Marshall, J., concurring). In so holding, several members of the Court pointed out that the statutes at issue in that case did not provide the sentencer with sufficient guidance, and that unguided jury discretion would lead to arbitrary and discriminatory sentences which violated the Eighth Amendment's prohibition against cruel and unusual punishment.
*919 Subsequently, the Supreme Court has repeatedly held that the sentencing process must include an individualized assessment of the character and record of the offender as well as the circumstances of the offense. In other words, for a death penalty scheme to meet constitutional muster, it must provide the sentencer the opportunity to consider and give effect to relevant mitigating evidence concerning any aspect of the defendant's background and the circumstances surrounding the offense. See Penry v. Johnson, 532 U.S. 782, ___, 121 S.Ct. 1910, 1920, 150 L.Ed.2d 9 (2001) (Penry II); Penry v. Lynaugh, 492 U.S. 302, 318, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (Penry I); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Indeed, the Court in Woodson struck down North Carolina's capital sentencing scheme because it rigidly mandated a sentence of death upon a conviction for first-degree murder. Justice Stewart, in an opinion joined by Justices Powell and Stevens, found several constitutional problems, including a failure to allow particularized consideration of relevant aspects of the character and record of the defendant before imposing a sentence of death:
In Furman, members of the Court acknowledge what cannot fairly be denied that death is a punishment different from all other sanctions in kind rather than degree. A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as a uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.
Id. at 303-04, 96 S.Ct. 2978 (citations omitted). Justice Stewart concluded that the Eighth Amendment's prohibition against cruel and unusual punishment "requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Id. at 304, 96 S.Ct. 2978.
Two years later in another plurality opinion, the Court in Lockett concluded that under the Eighth and Fourteenth Amendments, the State must allow the sentencer to consider "any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604, 98 S.Ct. 2954. Chief Justice Burger stated in an opinion in which three other justices joined:
Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases. A variety of flexible techniquesprobation, parole, work furloughs, to name a fewand various postconviction remedies may be available to modify an initial sentence of confinement in noncapital cases. The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the *920 need for individualized consideration as a constitutional requirement in imposing the death sentence.
Id. at 605, 98 S.Ct. 2954. Similarly, the Court in Eddings declared, "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence." 455 U.S. at 113-14, 102 S.Ct. 869. The Court further explained that while the sentencer may determine the weight to be given relevant mitigating evidence, it may not give such evidence no weight by excluding such evidence from its consideration. See id. at 114-15, 102 S.Ct. 869. Thus, Eddings teaches us that the Eighth Amendment not only requires the capital sentencing jury to "consider" relevant mitigating evidence, it must also give effect to that evidence in imposing sentence. See Penry I, 492 U.S. at 319, 109 S.Ct. 2934.
Penry, Eddings and Lockett make clear, therefore, that it is not enough that a capital defendant be permitted to present mitigating evidence; juries must be told to consider such evidence and give effect to it in recommending a sentence. See also Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). As Justice Stewart, writing for a three-member plurality opinion in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), in which the Court upheld Georgia's capital sentencing scheme, explained:
[T]he provision of relevant information under fair procedural rules is not alone sufficient to guarantee that the information will be properly used in the imposition of punishment, especially if sentencing is performed by a jury. Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with information they are given. To the extent that this problem is inherent in jury sentencing, it may not be totally correctable. It seems clear, however, that the problem will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision.
The idea that a jury should be given guidance in its decisionmaking is also hardly a novel proposition. Juries are invariably given careful instructions on the law and how to apply it before they are authorized to decide the merits of a lawsuit. It would be virtually unthinkable to follow any other course in a legal system that has traditionally operated by following prior precedents and fixed rules of law. When erroneous instructions are given, retrial is often required. It is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations.
Id. at 192-93, 96 S.Ct. 2909 (plurality opinion) (citations and footnote omitted). The United States Supreme Court recently reaffirmed this principle in Penry II.
The Court had reversed Penry's sentence in 1989 because the capital sentencing jury had not been "instructed that it could consider evidence offered by Penry as mitigating evidence and that it could give mitigating effect to that evidence in imposing sentence." Penry I, 492 U.S. at 320, 109 S.Ct. 2934. On appeal following remand and retrial after Penry was again sentenced to death, the Supreme Court held in Penry II that the trial court had misunderstood its directive in Penry I. In again finding the mitigation instructions inadequate, the Court reiterated:

Penry I did not hold that the mere mention of "mitigating circumstances" to a capital sentencing jury satisfies the Eighth Amendment. Nor does it stand *921 for the proposition that it is constitutionally sufficient to inform the jury that it may "consider" mitigating circumstance in deciding the appropriate sentence. Rather, the key under Penry I is that the jury be able to "consider and give effect to [a defendant's mitigating] evidence in imposing sentence." For it is only when the jury is given a "vehicle for expressing its `reasoned moral response' to that evidence in rendering its sentencing decision," that we can be sure that the jury "has treated the defendant as a `uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence[.]"
Penry II, 121 S.Ct. at 1920 (quoting Penry I, 492 U.S. at 319, 328, 109 S.Ct. 2934) (citations omitted). The bottom line of these Supreme Court decisions is that juries must be given explicit and adequate instructions as to the factors they must consider in deciding whether to impose a sentence of death.
Consistent with the U.S. Supreme Court's repeated concerns, juries should be provided with specific guidance as to the type of nonstatutory mitigating factors that they may consider. Because the overly brief "catch-all" jury instruction neither mentions nor defines the various categories of nonspecific mitigation a Florida jury may consider, it may well be inadequate to provide for the type of individualized assessment of mitigation that the Supreme Court has mandated. The fact that the aggravation to be considered by a jury is highly specific underscores the problem. Section 921.141, Florida Statutes (2000), clearly identifies fourteen aggravating factors, which include everything from the nature of the crime and criminal record of the accused to the age and frailties of the victim.[16] On the other hand, the brief "catchall" provision by its very brevity and general nature may actually diminish the jury's consideration of particular mitigation.
While our decisions over the years have explained the numerous and varied types of evidence that may properly be considered as nonstatutory mitigating factors,[17] we must be mindful of the fact that juries are not trained in the intricate law and rules of capital jurisprudence. Rather, we rely on the trial courts to inform juries of the factors they may consider during their deliberations.[18] The fact that the defendant argues for and presents evidence of nonstatutory mitigators for the jury's consideration does not necessarily mean that the jury will consider and give effect to such evidence if there is no meaningful *922 instruction from the trial court permitting consideration of the mitigation.
Fortunately, a review of many trial records that come to this Court reflects that many trial courts in Florida do act when requested to supplement the "catch-all" instruction by identifying to the jury certain categories of mitigation that may be claimed by the defendant in the particular case, and for which evidence has been presented. By giving these supplemental instructions, trial courts ensure compliance with the U.S. Supreme Court's mandate that juries are properly informed as to the matters they may consider in their deliberations.
PARIENTE, J., concurs.
NOTES
[1] Downs alleges that his appellate counsel was ineffective for (1) failing to argue on appeal that the State improperly referred to Downs' post-arrest silence; (2) failing to argue on appeal that the trial court erred in refusing to instruct the jury that it could consider mercy during its deliberations; (3) failing to argue on appeal that the trial court erred in refusing to instruct the jury that it could consider the leniency given to the codefendants and doubt as to whether Downs was the triggerman; (4) failing to argue on appeal that the trial court improperly considered a presentence investigation report; (5) failing to argue on appeal that the trial court erred in refusing to instruct the jury on the law of principals; (6) raising the wrong argument on appeal concerning the denial of Downs' request to subpoena the State Attorney; (7) failing to argue on appeal that the trial court erred in denying Downs' request to disqualify the State Attorney's Office; (8) failing to properly brief the issue concerning the trial court's exclusion of Bobbie Jo Michael's deposition testimony; (9) failing to argue on appeal that the State improperly introduced evidence that Downs was carrying false identification at the time of his arrest; (10) failing to challenge improper comments by the prosecutor during closing argument; (11) failing to argue on appeal that the trial court improperly denied Downs' motion to disqualify the court; and (12) failing to argue on appeal that the jury instructions improperly shift the burden of proof to the defense.

We find claims (4), (6), (8), and (12) to be either procedurally barred or without merit. With regard to claim (4), the record conclusively shows that the trial court did not consider a presentence investigation report in sentencing Downs, and therefore this claim is without merit. Claim (12) is both procedurally barred and without merit. In Downs' appeal from the denial of his 3.850 motion, this Court found that his claim that appellate counsel was ineffective for failing to object to the burden-shifting penalty-phase instructions was without merit as a matter of law. See Downs, 740 So.2d at 509 n. 5. Similarly, claims (6) and (8) are procedurally barred because Downs' attorney actually raised those claims on direct appeal. Downs' assertion in this petition that these claims were inadequately argued on appeal merely expresses dissatisfaction with the outcome on appeal, in that it did not result in ruling favorable to Downs. Therefore, we decline to reconsider those claims in this petition. See Rutherford v. Moore, 774 So.2d 637, 645 (Fla.2000) (holding that where defendant merely expresses dissatisfaction with the argument raised by appellate counsel on direct appeal, which this Court rejected, this Court should decline to reconsider claim in the habeas petition). A habeas petition should not be used as a vehicle for relitigating claims that were raised and rejected by this Court in prior proceedings. See Thompson v. State, 759 So.2d 650, 657 n. 6 (Fla.2000).
[2] As an additional matter, the State moves this Court to dismiss the petition because (1) it was filed more than twenty years after Downs' conviction and sentence became final, and therefore requires dismissal under McCray v. State, 699 So.2d 1366 (Fla.1997), and (2) it was not filed simultaneously with the most recent appeal from the denial of his 3.850 motion as required under rule 9.140(b)(6)(E) of the appellate rules. We deny the State's motion for the same reasons expressed in Mann v. Moore, 794 So.2d 595 (Fla.2001).
[3] The state attorney stated the following during closing argument:

He claims he cooperated. Well, you heard the testimony of Detective Starling, it didn't happen that way. They confronted this defendant... when he was in Alabama.
All right, when the defendant was in Alabama they locate him in Alabama. They tell him, Larry Johnson said youall were involved in this thing, and you did this and you did that. What did he say? No way, but I know about some insurance things. Give us some names. I'm not going to tell you. Take me back to Jacksonville, maybe I will. He comes back here, and doesn't tell them. Well, he doesn't tell the police anything, he doesn't cooperate at all.
And lo and behold yesterday you hear this whole story about how Larry Johnson was involved, and Barfield, and everyone else.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] In State v. Hoggins, 718 So.2d 761 (Fla. 1998), this Court held:

Regardless of whether evidence of postarrest silence is introduced in the state's casein chief or for impeachment purposes, the same test applies. If the comment is fairly susceptible of being construed by the jury as a comment on the defendant's exercise of his or her right to remain silent, it violates the defendant's right to silence.
Id. at 769.
[6] The transcript from Downs' initial trial is even more revealing. There, Detective Spaulding testified that he and Starling interviewed Downs while he was in prison in Alabama on unrelated charges. The interview took place twice over the course of two days, August 3 and 4, 1977. Spaulding testified that on both days Starling informed Downs of his constitutional rights, which Downs waived. The waiver of rights form that Downs signed was admitted in evidence. The record discloses that after waiving his rights, Downs told the officers that he had contacted the F.B.I. about the Harris case and that he promised to tell them more about the case upon his return to Jacksonville. Downs also denied any involvement in the murder.
[7] Downs requested the following instruction: "You may consider as a mitigating factor the immunity and deals given to the co-defendants." This case centered around a conspiracy to commit murder, which involved several participants. Downs was the person hired to actually kill Harris. However, Larry Johnson, another co-conspirator, was present at the time of the murder. Johnson was granted total immunity in exchange for his testimony against Downs. See Downs, 572 So.2d at 896-97. The other participants either had their charges dropped or received lesser sentences. See id. at 897 n. 2.
[8] Downs requested the following instruction: "However, if you have any lingering feelings of doubt about whether or not he was the trigger person, you may consider that in weighing the mitigating circumstances against the aggravating circumstances." We initially note the failure to give this instruction was raised and rejected on direct appeal following resentencing. See Downs, 572 So.2d at 900 ("[W]e reject the claim that the jurors should have been instructed to consider any lingering doubt they may have had about Downs being the triggerman."). Because Downs is merely expressing dissatisfaction with the outcome of the argument, in that it did not achieve a favorable result on direct appeal, we decline to reconsider the same argument in a habeas petition. See Rutherford, 774 So.2d at 645 (holding that if an issue was actually raised on direct appeal, the Court will not consider a claim that appellate counsel was ineffective for failing to raise additional arguments in support of the claim on appeal).
[9] The record is unclear as to this proposed jury instruction. It appears that Downs, arguing pro se, urged the court to take judicial notice of the section in the Florida Statutes pertaining to principals. The trial court reserved ruling on this claim. At the jury instruction conference, Downs' proposed instructions did not include an instruction on principals. Thus, it appears that any request for an instruction on principals was abandoned by the defense. Therefore, appellate counsel cannot be deemed ineffective for failing to argue this issue on appeal.
[10] Downs filed a similar motion in 1983 during his first 3.850 motion proceedings, alleging that Judge Pate could not evaluate the testimony and evidence in an impartial manner because she had knowledge that Johnson had passed a polygraph test. The judge denied the motion on the ground that it was filed solely to delay the hearing on Downs' 3.850 motion.
[11] Because we find the motion legally insufficient, we decline to address the State's argument that the motion was untimely.
[12] Previously, capital habeas petitions were not required to be brought at the same time as the appeal from the denial of a 3.850 motion. This has now been changed, and a capital habeas corpus petition must be brought at the same time as the appeal of the trial court's denial of a defendant's rule 3.850 motion. See Mann v. Moore, 794 So.2d 595 (Fla.2001); Fla. R.App. P. 9.140(b)(6)(E).
[13] Claims of trial counsel ineffectiveness are tested in a rule 3.850 motion. If a defendant wishes to challenge trial counsel's failure to object to the purported fundamental error, the defendant may do so in a rule 3.850 motion. That is why this Court states that claims which could have been raised in a 3.850 motion are not authorized in a habeas proceeding. See, e.g., Parker, 550 So.2d at 460. Of course, appellate counsel may raise instances of fundamental error on direct appeal of a first-degree murder conviction notwithstanding the failure of trial counsel to object and preserve the issue. The reason for this rule is to uphold the integrity of the judicial system and not to protect the interest of any particular aggrieved litigant. See generally Maddox v. State, 760 So.2d 89, 98 (Fla. 2000).
[14] The majority states: "Downs argues that his Fifth Amendment rights were violated when the prosecutor elicited testimony from Downs about his post-arrest silence." Majority op. at 910 (emphasis added).
[15] The catch-all instruction provides for consideration of: "4. Any other aspects of the defendant's character or record, and any other circumstances of the offense."
[16] The current list of statutory aggravators contains three more aggravators than at the time Downs was resentenced. Clearly, the statutory scheme is expanding, rather than narrowing, the class of murders subject to the death penalty. Further, since a single aggravator can qualify a defendant for the death penalty, there are few, if any, first-degree murder cases that will not be subject to the death penalty.
[17] See, e.g., Walker v. State, 707 So.2d 300, 318 (Fla.1997) (finding evidence of defendant's abusive childhood, honorable discharge from military, gainful employment, good qualities, and fact that he was deacon of church to be valid nonstatutory mitigating factors); Campbell v. State, 571 So.2d 415, 419 n. 4 (Fla.1990) (listing nonstatutory mitigators. which include but arc not limited to, abused or deprived childhood, contribution to community, remorse and potential rehabilitation, disparate treatment of equally culpable codefendant, and charitable and humanitarian deeds).
[18] Section 921.141 also lists several factors the jury may consider in mitigating the punishment for murder. The last factor permits the jury to consider any "other factors in the defendant's background that would mitigate against imposition of the death penalty." § 921.141(6)(h), Fla. Stat. (2000).