[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-14248

_____

D.C. Docket No. 3:01-cv-01399-HES-JRK


ERNEST CHARLES DOWNS,

Petitioner-Appellant,

versus


SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(December 5, 2013)

Before HULL, MARCUS and WILSON, Circuit Judges.

HULL, Circuit Judge:

Ernest Downs, a Florida death row inmate, appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition.  This appeal involves only the guilt phase of Downs's trial.  Downs argues that his convictions for first degree murder and conspiracy to commit first degree murder were obtained in violation of the Constitution because (1) the State withheld exculpatory evidence prior to his trial, (2) his trial counsel labored under a conflict of interest due to a contingency fee agreement, and (3) his trial counsel rendered ineffective assistance by failing to call certain witnesses during the guilt phase.  After review and oral argument, we conclude that Downs has not shown that the Florida state courts' decisions are contrary to or an unreasonable application of clearly established federal law.   We thus affirm the district court's denial of Downs's § 2254 petition.

## I. DOWNS'S TRIAL

On August 4, 1977, a Florida grand jury indicted Ernest Downs on two counts: (1) first-degree murder of Forrest J. ("Jerry") Harris, Jr., and (2) conspiracy to commit first degree murder of Harris.  The State charged that John Barfield hired Downs to kill Harris for $5,000, and that Downs recruited Larry Johnson to help with the murder.  Downs retained attorney Richard Brown to represent him.

Downs proceeded to a jury trial on the murder and conspiracy charges.  The guilt and innocence phase of this trial lasted from Wednesday, December 14

2

through Friday, December16, 1977.  In this murder-for-hire case, Downs's co-conspirator Johnson was the State's main witness.

## A.    Johnson's Trial Testimony

Johnson testified that, in April 1977, he met with Downs, Barfield, and a man named Gerry Sapp to discuss killing Harris.  On the day of the murder, April 23, 1977, Downs told Johnson that Harris was expecting a call from someone named Joe Green to discuss transporting some contraband.  That afternoon, Johnson and Downs drove in Downs's pickup truck to the Baymeadows area in Jacksonville, Florida, where the killing was supposed to occur.  They went to a phone booth to call Harris for the purpose of luring him out.  At that point, Johnson told Downs to "forget killing" Harris, but Downs insisted that Johnson make the call.  Johnson complied and called Harris, identifying himself as Joseph Green.  A woman answered the phone and said that Harris would be back shortly.

Downs and Johnson then drove by Harris's apartment, and when they saw Harris arrive, they went back to the phone booth.  Johnson testified that he again expressed his unwillingness to proceed with the murder, but Downs became "edgy" and insisted that Johnson call Harris.  Johnson once more called Harris, and this time Harris answered the phone.  Johnson identified himself as Joe Green and told Harris that he wanted to meet him at a nearby lounge to "talk some business."

Johnson testified that, after the call, he told Downs that he was not going to

3

proceed with the murder, and, if Downs wanted to kill Harris, he (Downs) would have to do it alone.  Downs became "really angry" and insisted that Johnson get in the truck with him.  Johnson complied and got in the truck because he feared that Downs might shoot him, but again told Downs that he was not going to kill Harris.  Downs "got really mad at that point, jerked the truck in gear," and instead of going to the lounge, drove down to the end of a nearby dirt road.  Downs then told Johnson to get out of the truck, threw him a .45 caliber machine gun, told him to stay put, and drove off.

Johnson testified that, when left alone, he hid the machine gun under "some boards" because he had no intention of using it.  Then he waited.  After some time, Downs came back in the truck with Harris.  Harris stepped out of the truck, walked up to Johnson, and introduced himself.  Johnson, who was "kind of numb at this point," introduced himself as Johnson, not Joe Green.  Harris stepped back and looked at Johnson "kind of funny."  As Johnson began to explain that he used an alias, Downs took out a .25 caliber pistol and fired four shots at Harris.

Johnson described the shooting as follows:

[Downs] brought up the .25 automatic and fired at him. . . . [After the first shot, Downs] kind of jumped up in the air and come down backwards a few feet and almost stumbled and fell down.  He righted himself and fired three more times still stumbling backwards.  [Downs] fell into the side of the truck . . . and fired three more times at him, and then he stumbled backwards and went completely around behind the truck out of my sight.

4

Harris staggered back and fell down in front of Johnson.  Downs then "came out from behind the truck and ran around front and leaped over Jerry Harris, and Harris's head was off the ground."  Downs "stuck the gun up to the right side of [Harris's] head and fired again point-blank," at which point "Harris laid down."

Johnson testified that he and Downs dragged Harris's body into the woods behind the dirt road.  They removed car keys, identification, and some cash from Harris's pockets.  Downs took the identification, Johnson pocketed the money, and they threw away the car keys.  Downs then fired one more bullet into Harris's chest.

Downs and Johnson drove away from the scene, but returned to pick up the the machine gun and to drag Harris's body further into the woods.  Afterwards, on the way home, Johnson threw the .25 pistol off a bridge into a river.

Johnson testified that the day after the murder, he and Downs visited Barfield.  Downs showed Harris's driver's license to Barfield, told Barfield that the job was completed, and demanded payment.  Barfield assured Johnson and Downs that he would have their money within several days.  Barfield eventually gave cash to Downs in payment for the killing, and Downs gave Johnson a Corvette.

Having received payment, Johnson and Downs traveled to the Florida Keys, Mexico, Texas, and Alabama for several weeks.  Johnson testified that he did not

5

inform the authorities about the murder at this time because he "was afraid that [Downs] may get revenge on me or my family or something," and "was afraid of being arrested for the murder myself."

Downs stayed in Alabama, but Johnson returned to Jacksonville in late July of 1977, more than three months after the Harris murder. Johnson talked about the murder to Downs's sister, Darlene Perry, who was also Johnson's girlfriend. Johnson also talked to Downs's grandfather. Johnson then contacted Detective Jim Spaulding, told him about the murder, and led law enforcement to Harris's body. In exchange, Johnson obtained full immunity from prosecution.

On cross-examination, Johnson admitted that his immunity would be revoked if he testified that he had killed Harris. His immunity would also be revoked if he did not tell the truth.

## B.    Sapp's Trial Testimony

Another witness, Gerry Sapp, described how Barfield hired Downs to kill Harris. Sapp testified that, when he was riding with Barfield to Downs's house, Barfield told Sapp that he (Barfield) was going to ask Downs to kill Harris. Barfield told Sapp that he "didn't know Larry Johnson too good," did not trust Johnson, and would not ask Johnson to kill Harris.

When Sapp and Barfield arrived at Downs's house, Downs and Johnson were inside the garage working on a truck. Barfield called Downs outside, and

6

they walked behind the house and talked for a few minutes.  When Barfield and Downs returned, Downs told Johnson that he was going to kill a man for $5,000.  Downs also said that he wanted to be paid immediately after the murder, "with no questions asked."  When Barfield asked how he would know that Harris was killed, Downs said that he would bring back proof of the killing, like a driver's license.

## C.    Detective Spaulding's Trial Testimony

Detective Spaulding testified that he met Johnson in August 1977, and Johnson directed him to Harris's body.  Spaulding eventually arrested Downs in Alabama.  In a post-arrest interview, Downs told Spaulding that he (Downs) "had contacted the Mobile, Alabama F.B.I. office and asked them to contact the Jacksonville F.B.I. office in reference to the Jerry Harris case."  Before Downs made this statement, Spaulding did not tell Downs why he (Spaulding) was in Alabama, did not tell Downs that Harris's body was found, and did not even mention Harris's name.

In another post-arrest interview, Downs told Spaulding that he would tell Spaulding "all [he] needed to know about the case" when they came back to Jacksonville.  Spaulding asked Downs if he was going to confess to Harris's murder, and Downs replied: "More than likely."  However, on cross-examination, Spaulding admitted that Downs also denied murdering Harris on multiple occasions during his post-arrest interviews.

7

## D.    Post-Trial Proceedings

When the State rested, the trial court asked attorney Brown if he was ready to proceed with Downs's defense.  Brown responded: "Yes, Your Honor.  Yes. Just a moment, Your Honor."  At this point, the trial transcript reflects a "[b]rief pause."  After the pause, Brown announced that the defense rested, and no more witnesses were presented.

The jury convicted Downs on both counts: (1) first degree murder and (2) conspiracy to commit first degree murder.  On December 20, 1977, an advisory sentencing hearing (the "penalty phase" of the trial) was held before a jury, after which a "majority" of the jurors recommended a death sentence.[1]

At the final sentencing hearing, held on January 27, 1978, the state trial court adopted the jury's recommendation and sentenced Downs to death on the first-degree-murder charge.  The trial court also imposed a 30-year sentence on the conspiracy charge.

On direct appeal, the Florida Supreme Court affirmed Downs's convictions and sentences.  Downs v. State, 386 So. 2d 788 (Fla. 1980).  The U.S. Supreme Court denied certiorari.  Downs v. Florida, 449 U.S. 976, 101 S. Ct. 387 (1980).

---

[1]The State later noted that the jury's recommendation of death was unanimous.

## II. DOWNS'S REQUEST FOR POST-CONVICTION RELIEF

### A.    Downs's Initial Rule 3.850 Motion

In June 1982, Downs filed his first Rule 3.850 motion for post-conviction relief in state court, raising numerous claims, three of which are pertinent to this appeal. [2]

First, Downs argued that his contingency fee agreement with counsel Brown created a conflict of interest that deprived Downs of effective assistance of trial counsel.  In his retainer agreement with Brown, Downs agreed to pay Brown a minimum fee of $5,000, and then $50 per hour.  Additionally, Downs agreed to pay a $10,000 "bonus fee" if he was "acquitted of all felony charges arising from the death of Jerry Harris."  Downs contended that the prospect of a $10,000 bonus may have prevented Brown from presenting crucial evidence for the defense. Specifically, Brown had told Downs that putting on witnesses would mean losing the conspiracy count.  However, Downs actually might have benefited from testifying and admitting to a limited participation in the conspiracy, thereby possibly avoiding a murder conviction.

Second, Downs alleged that Brown rendered ineffective assistance at the guilt/innocence phase by failing to call three defense witnesses: (1) Downs

---

[2]Downs filed a second Rule 3.850 motion after his resentencing, but only his first 3.850 motion is relevant to this appeal.

9

himself, who would have testified that he did not kill Harris; (2) Sharon Darlene Perry, Downs's sister and Johnson's lover, who would have testified that Johnson told her that he (Johnson) killed Harris; and (3) Downs's grandmother, Bobbie Jo Michael, who would have testified that Downs was at her house on the evening of April 23, 1977, when Harris was shot.

Third, in a supplement to his Rule 3.850 motion, Downs alleged that the State withheld material exculpatory evidence prior to trial, in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). The alleged exculpatory evidence consisted of, in pertinent part, Barfield's recorded statements to a cellmate, Harry Murray, wherein Barfield told Murray that Johnson had told Barfield that he (Johnson) was actually the one who killed Harris.

An evidentiary hearing was held on Downs's 3.850 motion in October 1982 and January 1983. At this hearing, the 3.850 court heard testimony from a number of witnesses, including Downs himself, his trial counsel Brown, detective Spaulding, and Barfield's cellmate Murray.

## B.    Downs's 3.850 Testimony

Downs testified about how he and his counsel Brown entered into the contingency fee agreement. Downs stated:

> I told Mr. Brown that I didn't have no money. And he said, well, he felt that he could have me acquitted of the first degree murder and would I be willing to work and pay him $10,000 as a bonus for doing

that?   And he said that the following day I would be taken before Judge [Dorothy] Pate, he would have me declared indigent, and that it was a formality.

When Downs arrived in court, Judge Pate asked Brown how he could represent Downs, given Downs's indigent status.  Brown told the judge that "it was all a matter of contract and that it had been taken care of, that he knew that [Downs] did not have any money, but he looked to get paid at a later date."

Downs also testified about his discussions with Brown about whether to testify and what witnesses to present.  Specifically, Downs told Brown that he wanted to testify.  And Brown never told Downs, prior to the last day of trial, that he (Brown) would not call Downs to testify.  Nor did Brown explain to Downs why he would not call Downs to testify.

Towards the end of November 1977, Downs informed Brown that he (Downs) would testify that he was at his grandmother Michael's house on the day of the crime.  Brown, however, advised Downs "not to say anything about that" because Brown wanted to "spring" the alibi defense on the State at trial.

Furthermore, Brown did not tell Downs prior to trial that the defense would rest without presenting witnesses, and Brown informed Downs of this decision only after the State finished its case-in-chief.  Downs testified that, when the State rested,

11

> Mr. Brown stood up, and then he come there and he put his hand on my shoulder and leaned down and he says, I can tell by looking at the jury that they know that you didn't kill Harris. He said, now, my concern at this point is the conspiracy charge.  He said, If you want to take the stand, you are going to have to admit conspiracy.  He said, And that carries up to a life sentence. He said So I'm advising you to forget about the murder charge, and let's focus on this conspiracy charge, and let's shoot for the best thing we can get out of it. He said, Because all the other co-defendants have gotten off light. So, he said, I see no reason for you to say anything at this point.

Brown also told Downs not to "worry about" having other witnesses testify for the defense.

> [Brown] said . . . we want to focus on this conspiracy thing.  And . . . if I don't call no other witnesses, . . . then I'll have opening and closing arguments.  And [Brown] informed me at that time to just let the defense rest.

Downs testified that he "knew nothing about this [tactic] right up until the last moment."

Downs further testified regarding the events surrounding Harris's murder. Downs asserted that he did not kill Harris and was not present during the shooting. Downs admitted, however, that Barfield approached him about the murder on April 18, 1977, when Barfield and some other men came to Downs's house.  Barfield walked with Downs behind the house and told him that he (Barfield) "wanted an individual killed for $5,000, and . . . would [Downs] approach Johnson to do it?" Barfield explained that "he didn't know [Johnson] that well right then," but "knew

12

that [Johnson] and [Downs] were real tight." Downs assured Barfield that he "would take care of it."

Downs testified how he had been friends with Johnson for a long time, and how Johnson had oftentimes exerted a bad influence on him, leading him to commit crimes. During the time period leading up to Harris's murder, Downs employed Johnson in a construction business Downs owned.

Downs talked to Johnson about Barfield's proposition, and Johnson agreed to kill Harris. Downs testified that, on the afternoon of the murder, April 23, 1977, "it became increasingly apparent that Johnson was going to go through with this and it was no longer a game anymore." At that time, Downs told Johnson to "forget it," but Johnson said he wanted the $5,000.

At approximately 7:00 p.m. that evening, Downs again told Johnson to abandon the plan, but Johnson refused. Downs then told Johnson that "if he did it he was on his own." Johnson responded that he had already practiced shooting the gun and "[f]igured out how he was going to do it."

Downs then left Johnson and went to Michael's (Downs's grandmother's) house, arriving there around 7:30 p.m. At approximately 10:30 p.m., Johnson came to Michael's house in a black pickup truck, and told Downs that "he had done it." Downs noticed that "the rifle" (the .45 machine gun) was missing from the truck, and asked Johnson where the rifle was. Johnson responded that he "got

13

nervous with that rifle, and . . . drove down to the end of the road and put it under a pile of wood." Downs became scared that the police would find the rifle when they found Harris's body, and so Downs went with Johnson to the place of the murder to retrieve the rifle. Afterwards, on the way home, Johnson threw the .25 caliber murder weapon off a bridge. When Downs and Johnson returned to Downs's house, they also disposed of Johnson's clothing by throwing it in a creek.

Downs testified that his attorney Brown did not want to know Downs's version of the facts concerning Harris's murder "because of the conspiracy charge." Brown only wanted to know what happened to the murder weapon.[3]

## C.    Attorney Brown's 3.850 Testimony

Brown testified that the contingency fee agreement had no effect on his representation. Brown received only about $40 of attorney's fees from Downs. However, the possibility of a $10,000 bonus did not affect his representation of Downs in any way or at any time, and Brown did not consider the possible bonus in making strategic decisions during the trial.

---

[3]Downs testified that he told Brown he wanted to take a polygraph test, and even borrowed $100 from his (Downs's) mother for the purpose. Brown took the money, but kept putting off the test until finally telling Downs that it "wasn't necessary."

Brown's 3.850 testimony mostly agreed with Downs's on this point. Brown testified that Downs wanted to take a polygraph test, and Brown obtained $100 from Downs's mother for the test. However, Brown never used that $100 for the polygraph exam, but instead used the money to cover other costs of the case. As a result, Brown was reprimanded by the Florida Bar Association.

Brown did hope to receive the $10,000 bonus when he first began representing Downs, but subsequently "all hope of receiving that $10,000 and even the minimum fee of $5,000 . . . pretty much faded." Brown realized within the first 30 days or so of representing Downs that it "would take a miracle" to obtain an acquittal on all felony charges. The "bonus" was out of Brown's mind at the time he began to try the case.

With regard to his ultimate decision not to present defense witnesses, Brown testified that he first began seriously considering the question the night before the last day of trial. Asked whether he thought about the issue prior to trial, Brown responded: "It's possible that I thought a little bit about it, but it didn't really come seriously into my consideration until that Thursday evening." When Brown began the trial on Wednesday, he was still planning to call witnesses, including Perry (Downs's sister) and Michael (Downs's grandmother). Brown explained: "We had a plan in advance of trial and it involved putting on witnesses. But the course of the trial reshapes that plan. And it did in this particular case." Brown testified that he could not make a fully informed decision about what evidence to present until immediately before the State rested. In fact, until the State rested, Brown did not tell his defense witnesses that they were not needed.

Brown testified that he probably did not talk to Downs about his decision not to present witnesses until the morning of the last day of the three-day trial. Brown

15

testified that he talked to Downs about this decision both after the State rested and earlier that day. When Brown raised the issue before the State rested, Downs "didn't demand" that Brown present a defense. After the State rested, Downs also did not protest, or object to, Brown's decision not to present witnesses.

Brown denied that he told Downs, after the State rested, that the jury knew Downs did not kill Harris. Brown also denied telling Downs that presenting defense witnesses would mean losing on the conspiracy count.

Brown testified in detail as to why he did not call Downs as a witness. Brown stated that "[i]t became evident very early in the preparation for this case that Mr. Downs could not take the witness stand . . . [o]n the guilt phase at least." Brown believed that Downs was present during Harris's murder. If Downs testified that he was present but Johnson fired the shot that killed Harris, it would have placed Downs at the scene assisting Johnson. This would have made Downs guilty of first degree murder too. Brown explained how Downs being at the scene but Johnson being the shooter was not a defense to the first degree murder charge:

> if [Downs] told the truth, even if he testified that Johnson fired the shot that killed Mr. Harris, it would have placed him at the scene of the crime in a position of assisting. And [Downs] would be as guilty of first degree murder. And he would be convicting himself.
>
> It was not a defense that he wasn't the one that fired the shot. It wasn't a defense to the first degree murder charge. It might be mitigation, but it wasn't a defense to the first degree murder charge that he wasn't actually the person who fired the shot.

16

If, on the other hand, Downs was going to deny his presence at the murder scene, Brown would not call Downs to testify "knowing that he was going to perjure himself on the witness stand."

Thus, before trial, Brown advised Downs against testifying, telling him "[t]hat he couldn't get on the stand and incriminate himself, that he couldn't get on the stand and commit perjury; [and] that if he attempted to tell a false story on the witness stand the jury would more than likely see through it." Brown testified that he had discussed with Downs "numerous times" the possibility of Downs testifying in his own defense.

Brown further explained why he concluded that Downs was present during Harris's shooting. Prior to trial, Brown went over the results of Harris's autopsy report with Downs, and Downs himself pointed out two errors in the report: (1) the report did not mention a chest wound on Harris, and (2) the report incorrectly described the caliber of the weapon used to kill Harris—.22 versus .25.

Additionally, Downs told Brown that the murder weapon was thrown off a bridge, and explained how he and Johnson disposed of the clothes that either Downs or Johnson wore on the night of the homicide. Downs also told Brown that he "wished that he had returned to the scene of the murder and moved the body." Consequently, based on his discussions with Downs, Brown concluded that Downs

17

was present at the murder scene and was involved in the conspiracy to murder Harris. And Downs never told Brown that he had withdrawn from the conspiracy. Given that Downs was at the murder scene, Brown intentionally never asked Downs whether he (Downs) was the one who actually shot Harris.

Brown testified, however, that Downs "always accused Johnson of killing Mr. Harris." Moreover, Downs never told Brown that he was present when Harris was shot, and Brown "never pursued that point." Brown also acknowledged that Downs did not tell him what he (Downs) would say on the witness stand.

Another possible reason for Brown's decision not to call Downs as a witness was Downs's prior convictions. Although Brown "may have mentioned" to Downs that he (Downs) could be impeached by his prior criminal convictions, Brown "was less concerned with that than [he] was with the fact and circumstances of the homicide and [Downs's] presence at the scene of the homicide, and his participation in it."

Brown testified that he had advised Downs several times not to take the stand. Brown recalled: "Sometimes [Downs] would argue about it and other times he would seem to go along with it. And in the final analysis, he didn't argue about it and he didn't protest. He acquiesced in my decision not to put him on the witness stand."

18

Brown also testified about his reasons for not calling Perry and Michael as witnesses. Brown did not call Perry, who is Downs's sister, because he felt that she was not credible. Brown stated that "if you ask her the same question three times, you would get three different versions of what she had hear[d] or seen or so forth." Moreover, the fact that Perry was Downs's sister undermined her credibility. Brown further explained that, if the State asked Perry the right questions, her testimony would have placed Downs at the murder scene. After Brown talked to Downs about Perry's value as a witness, Downs "never insisted that [Brown] put her on the stand," although he might have "urged" Brown to do so.

As to Michael, Downs's grandmother, Brown believed her testimony to be of minimal value because she was not at the scene of the homicide and did not know how it occurred. Although Michael "knew something about Johnson" and could have testified to his bad character, Brown weighed that type of testimony "versus losing the right to open and close, [and] there was no contest as far as [he] was concerned." Brown explained that the right to open and close the argument "became more and more important to [the] defense because of the testimony and evidence that was left to it and the quality of that testimony and evidence."

Furthermore, Brown feared that Downs's grandmother Michael would perjure herself if she testified that Downs was with her on the night of the murder.

19

Michael never mentioned this alibi when Brown first talked to her, and she could not answer or substantiate any of the details regarding the alibi. Specifically, Brown stated:

> I have talked to Bobbie Jo Michael on several occasions prior to this alibi issue being raised. There had been no mention from Bobbie Jo Michael that Mr. Downs was at home at the time of the homicide. Then one day when I was talking with Mr. Downs in the jail, he told me, call Bobbie Jo Michael. She knows that I was home at her home that night of the homicide. And so I did. I followed it up and called Bobbie Jo Michael. At that point she reiterated the fact that yes, she believed that he was home the night of the homicide. But I didn't stop there. I pursued questioning her further as to how she knew this particular date, what time he was home and other details.
>
> She couldn't answer and substantiate any of the details. And that was a factor combined with the other evidence that I had investigated and foundout [sic] that caused me not to file any alibi defense because I concluded that there was no alibi defense.

Before trial, Michael testified at a deposition, but did not mention the alibi defense. Brown admitted that he told Michael not to reveal the alibi defense during her deposition. Brown testified: "I told her not to reveal the alibi defense [unless] the question specifically necessitated it, unless it specifically required it."

Brown testified that he discussed with Downs whether or not to call Michael as a witness, and Downs did not demand that she be called.

**D.    Detective Spaulding's 3.850 Testimony**

20

Detective Spaulding testified regarding his conversations with Murray, Barfield's cellmate. The first conversations with Murray that Spalding mentioned in his 3.850 testimony occurred at the jail in October of 1977. In Spaulding's October 1977 conversations with Murray, Spaulding learned that "Barfield had told [Murray] all about the murder," but Murray "didn't go into detail" with Spaulding about what Barfield "said happened on the night" of the Harris murder.

Spaulding informed prosecutor Dennis Guidi of his October 1977 conversations with Murray and discussed the possibility of wiring Murray. Murray agreed to be wired as early as October 1977, but Guidi advised Spaulding not to wire Murray at that time. Although Spaulding had several other conversations with Murray in October and November 1977, Murray was not wired until December 1977. Even then, the first recordings of Murray's conversations with cellmate Barfield were unintelligible, and Spaulding destroyed or taped over those recordings.

Murray's first intelligible recording of a conversation with Barfield, spread over two or three tapes, was made on January 9, 1978, several weeks after the guilt phase of Downs's trial had concluded on December 16, 1977. While listening to the tape recording of the January 9, 1978 conversation between Murray and Barfield, Detective Spaulding took notes. According to Spaulding's notes, Barfield told Murray that Johnson told Barfield that he (Johnson) had shot Harris.

21

Specifically, Barfield told Murray: "Harris jumped back and said, What the hell is going on?  And then Johnson shot him."  Barfield further stated (as heard on the tape, according to Spaulding's notes): "Johnson, fuck him. He's lying on everybody.  Don't worry about Johnson.  Just like Lacy [Barfield's lawyer] always says, If they all offer me immunity, I'll say Nixon killed him.  Who does he give a fuck killed him."

Spaulding was asked at the 3.850 hearing whether he could recall specifically when "Mr. Murray related to [him] that Mr. Barfield was saying that Johnson was the one who shot Mr. Harris."  Spaulding responded: "The only time that that came up was in the tape on January the 9th."  Spaulding did not recall Murray telling him this information at "[a]ny time prior to" January 9, 1978.

E.    **Murray's 3.850 Testimony**

Murray testified that he met Barfield in a Florida prison around September 1977.  Murray talked with Barfield about Harris's murder daily from September 1977 to January 1978.  During one of their conversations, Barfield told Murray that Johnson was the triggerman.[4]

---

[4]In October 1977, Barfield also asked Murray to kill Downs.  Barfield additionally told Murray that he planned to help an inmate escape and take hostage a busload of children to secure Barfield's release.

Murray testified that he told Detective Spaulding about this conversation with Barfield as early as October 1977, and also told Barfield's prosecutor, Gardner, about the conversation. Murray told Spaulding exactly what Barfield told him. Spaulding responded that he would "talk to the Prosecutors about it," including Guidi. In October and November of 1977, Spaulding assured Murray "[n]umerous times" that he had spoken to the prosecutors and related to them "exactly" what Murray told him. As a result, a decision was made to place a wire on Murray to record a conversation with Barfield.

Murray testified that Barfield told him how he knew that Johnson actually killed Harris. According to Barfield, when Johnson came back from the murder scene, Johnson told Barfield that he (Johnson) was by himself and that "Downs was supposedly been left down at some lounge off of Baymeadows Road, and Johnson done the actual killing." Asked whether Barfield said that Downs was with Johnson at the time of the killing, Murray responded:

> Well, the way [Barfield] stated to me, that they had met Harris at the lounge, I believe it was at Jax Liquors there, and Johnson went with the guy by himself because he didn't want to go off with two people. [Johnson] was a little leery of [Harris] at the time . . . Harris was flying drugs in and out, and he went off with Johnson, and Johnson was supposed to have done the actual killing of him.

Murray admitted, however, that he had testified previously during a suppression hearing that Barfield told him: (1) that both Downs and Johnson were

23

at the scene of the crime; (2) that Johnson fired the first three shots at Harris; and (3) that Downs shot Harris again after Harris died.

Contrary to Spaulding's testimony, Murray testified that he told Spaulding before Downs's trial that Barfield said that Johnson said that he killed Harris.

## F.    The 3.850 Court's Decision

The 3.850 court issued a 7-page decision denying all of Downs's claims. As to Downs's claim that law enforcement withheld Brady materials, the 3.850 court made a fact finding that "[t]he only time that law enforcement heard that Barfield was saying that Johnson was the triggerman was January 9, 1978. This was after [Downs's] trial." The 3.850 court further concluded that "what a co-defendant (Barfield) said to a third person (Murray) would not be competent evidence as to [Downs]." Thus, "Murray's testimony of what a co-defendant told him would be inadmissible" in Downs's trial.

The 3.850 court also pointed to inconsistencies between Murray's and Barfield's statements. While Murray testified at the 3.850 hearing that "Barfield said that Johnson told him that he (Johnson) killed the victim," Barfield at his own trial "testified that he did not know who actually killed the victim." Also at Barfield's trial, Murray testified merely that "Johnson was 'supposed' to be the person who killed Harris." Finally, the 3.850 court found that Downs "was aware of Murray and his testimony prior to sentencing and during a co-defendant's trial."

24

As to Downs's claim that his lawyer's contingency fee agreement prejudiced his defense, the 3.850 court found that: (1) it was previously unaware of the contingency fee agreement until the 3.850 hearing; (2) this matter was known, however, at the time of direct appeal; and (3) the 3.850 court was presented with no evidence that the contingency fee arrangement affected trial counsel's representation.

As to Downs's claim that his lawyer Brown was ineffective for not calling defense witnesses, the 3.850 court found that Brown "was aware of and explored all possible—and probable—defenses with [Downs] prior to and during trial."  The 3.850 court further found that Brown "participated in over thirty (30) depositions or sworn statements of witnesses, filed discovery and other pre-trial Motions, obtained costs for employment of a private investigator and employed such an investigator to explore possible defenses, reviewed depositions taken by other attorneys of co-defendants, conducted legal research and talked with other attorneys representing co-defendants."

As for the possible alibi witnesses, the 3.850 court observed that both proposed witnesses, Michael and Perry, initially denied knowing where Downs was at the time of the murder, and that neither they nor Downs himself mentioned an alibi "until shortly before trial."  The 3.850 court further found that Brown's decision to not put Downs on the stand or present a "withdrawal" defense was a

25

strategic decision because the "withdrawal" defense "appear[ed] tenuous and legally insufficient."   Thus, the 3.850 court found that "[a]fter a review of all the evidence, the claims that counsel was ineffective because he did not offer proof of an alibi or other defense are not supported by the evidence."

## G.    Florida Supreme Court Affirms the Denial of Downs's 3.850 Motion

The Florida Supreme Court affirmed the 3.850 court's denial of Downs's 3.850 motion.  Downs v. State, 453 So. 2d 1102 (Fla. 1984).  The Court affirmed the denial of Downs's Brady claim without an explanation, simply stating that there was "no merit" to this claim and that the 3.850 court "ruled correctly."  Id. at 1104.

Regarding the contingency fee claim, the Florida Supreme Court concluded that: (1) "[a]lthough such a contingent fee contract is improper and unethical in a criminal case,[5] it does not alone establish denial of effective assistance of counsel;" (2) "[s]uch unprofessional conduct is one factor to be considered by the trial court under the totality of the circumstances in determining whether a defendant has been deprived of effective assistance of counsel;" (3) a "[d]efendant must prove

---

[5]The Rules Regulating the Florida Bar are consistent with the Florida Supreme Court's conclusion.  See Fla. Rules of Prof'l Conduct R. 4-1.5(f)(3)(B) (stating that "[a] lawyer shall not enter into an arrangement for, charge, or collect . . . a contingent fee for representing a defendant in a criminal case.").

26

that this agreement affected trial counsel's representation"; and (4) the "trial court properly concluded that there was no such showing in this case." Id. at 1109.

As to Brown's alleged ineffectiveness in failing to call witnesses, the Florida Supreme Court concluded that the 3.850 court's factual findings in this regard were supported by the record. Id. at 1106. Applying Strickland,[6] the Florida Supreme Court determined that Downs failed to show that Brown's decision not to call witnesses fell "outside the range of professionally competent assistance." Id. at 1109. Moreover, even if counsel acted unreasonably, Downs suffered no prejudice as a result. Id.

## H.    Subsequent State Post-Conviction Proceedings and Resentencing

After the denial of his first Rule 3.850 motion , Downs filed a petition for state habeas corpus relief in the Florida Supreme Court based on a substantial change in the law caused by Hitchcock v. Dugger, 481 U.S. 393, 107 S. Ct. 1821 (1987). The Florida Supreme Court granted relief and remanded for resentencing before a jury. Downs v. Dugger, 514 So. 2d 1069 (Fla. 1987).

---

[6]Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). Strickland was decided while Downs's 3.850 appeal was pending in the Florida Supreme Court, and thus the 3.850 court had not applied that case. See Downs, 453 So. 2d at 1106.

27

During that resentencing, Downs testified that he did not kill Harris and Barfield testified that Johnson claimed to have killed Harris. As described by the Florida Supreme Court,

> Downs's defense at the resentencing proceeding focused on establishing that he was not the triggerman and did not deserve the death penalty. Downs testified that Johnson drove him to the dirt road and dropped him off. Downs said he had changed his mind about participating in the murder, so he left the scene and went to the home of his grandmother, Bobbie Jo Michael. When Johnson found Downs at Michael's house later that night, Johnson was carrying Harris's driver's licence and money he took from the body. The next day, he and Johnson visited Barfield who paid Johnson $500 in partial payment for the murder.
>
> Downs offered the testimony of various witnesses to support his theory of penalty defense that Johnson—not Downs—was the triggerman. Barfield testified that on the day after Harris died, Johnson presented Harris's driver's licence as proof of the killing, and Johnson admitted at that time that he was the one who killed Harris. However, Barfield conceded that in his own trial in 1978, he testified that he had no knowledge of Harris's murder. Downs's sister, Darlene Shafer [Perry], also testified that Johnson told her he had killed Harris.

Downs v. State, 572 So. 2d 895, 898 (Fla. 1990). As noted, Barfield also conceded that he had testified earlier that he had no knowledge of Harris's murder.

After hearing all the evidence, the jury recommended a sentence of death by an eight-to-four decision. Id. The trial court followed the jury's recommendation and reimposed the death sentence. Id. at 897. The Florida Supreme Court affirmed the sentence on direct appeal. Id. at 901.

28

## I.    Federal Habeas Proceedings

In 2001, Downs filed a 28 U.S.C. § 2254 habeas corpus petition in the district court.  The district court denied the petition as untimely.  On appeal, this Court remanded the § 2254 case back to the district court for an evidentiary hearing on whether Downs's untimeliness could be excused due to equitable tolling.  See Downs v. McNeil, 520 F.3d 1311 (11th Cir. 2008).  The district court held an evidentiary hearing and ultimately found that Downs was entitled to equitable tolling of the one-year limitations period prescribed by 28 U.S.C. § 2244(d).

Downs then filed an amended § 2254 petition, raising a number of claims, including the three above claims raised in his initial 3.850 motion: (1) that the State violated Brady by withholding exculpatory evidence, namely, Barfield's statements to Murray that Johnson said he killed Harris; (2) that the contingency fee agreement with Brown violated Downs's Sixth and Fourteenth Amendment rights by creating an impermissible conflict of interest; and (3) that Downs received ineffective assistance of counsel during the guilt/innocence phase of his trial due to Brown's decision not to call any defense witnesses.

The district court denied all of Downs's § 2254 claims on the merits.  The district court, however, granted Downs a certificate of appealability ("COA") on two issues:

29

(1) whether counsel was ineffective for failing to call Darlene Perry and Ms. Michael as defense witnesses; and

(2) whether the State denied Petitioner due process under the Fifth and Fourteenth Amendments by withholding exculpatory evidence in violation of Brady v. Maryland . . . .

Subsequently, this Court granted Downs's motion to expand the COA to include these issues:

[3] Whether Appellant's trial counsel had an actual conflict of interest by entering into a contingent fee arrangement with Appellant and whether Appellant proved that the contingency fee adversely affected trial counsel's representation of Appellant; [and] . . .

[4] Whether trial counsel rendered ineffective assistance of counsel in not calling Appellant as a witness in the guilt phase of the trial.

### III. STANDARD OF REVIEW

Downs's federal habeas petition and appeal are governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Recognizing the foundational principle that "[s]tate courts are adequate forums for the vindication of federal rights . . . . , AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, — U.S. —, —, 134 S. Ct. 10, 15-16 (2013). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. —-, ——, 131 S. Ct. 770, 786-87 (2011). The purpose of AEDPA is "to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." Greene v. Fisher, 565 U.S. —-,——, 132 S. Ct. 38, 43 (2011) (internal quotation marks omitted). With this background, AEDPA permits federal courts to grant habeas relief in only two circumstances after a state court has denied relief. See 28 U.S.C. § 2254(d).

First, § 2254(d)(1) permits a federal court to grant habeas relief when the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1)). The phrase "clearly established Federal law" refers "to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000). A circuit court "may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent." Marshall v. Rogers, 569 U.S. —-,—-, 133 S. Ct. 1446, 1450 (2013). However, circuit precedent may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal

31

rule that [the Supreme Court] has not announced." Id.  Also, a circuit court "may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme Court], be accepted as correct." Id. at —, 133 S. Ct. at 1451.

The phrase "contrary to" means that the state court decision "contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts." Kimbrough v. Sec'y, DOC, FL, 565 F.3d 796, 799 (11th Cir. 2009).  Further, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by the [Supreme Court]." Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S. Ct. 1411, 1419 (2009) (internal quotation marks omitted).   "An unreasonable application of federal law is different from an incorrect application of federal law," Williams, 529 U.S. at 410, 120 S. Ct. at 1522; indeed, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable," Richter, 562 U.S. at —,131 S. Ct. at 787. As long as "some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." Loggins v. Thomas, 654 F.3d 1204, 1220 (11th Cir. 2011).

Second, § 2254(d)(2) allows a federal court to grant habeas relief when the state court decision "was based on an unreasonable determination of the facts in

32

light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As the Supreme Court recently reiterated, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Titlow, — U.S. at —, 134 S. Ct. at 15 (internal quotation marks omitted). "[E]ven if reasonable minds reviewing the record might disagree about the [fact] finding in question, on habeas review that does not suffice to supersede the [state] trial court's determination." Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849 (2010) (quoting Rice v. Collins, 546 U.S. 333, 341-42, 126 S. Ct. 969, 976 (2006)) (alterations omitted).

In short, the standard of § 2254(d) is "difficult to meet . . . . because it was meant to be." Titlow, — U.S. at —, 134 S. Ct. at 16 (internal quotation marks omitted). This "highly deferential standard" demands that "[t]he petitioner carries the burden of proof," Cullen v. Pinholster, 563 U.S. —, ——, 131 S. Ct. 1388, 1398 (2011) (internal quotation marks omitted), and "that state-court decisions be given the benefit of the doubt," Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002).

AEDPA's substantial deference applies to all issues raised in Down's § 2254 petition. An additional layer of deference applies to Downs's claim of ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).

For this <u>Strickland</u> claim, Downs had to show to the state court "that his counsel provided deficient assistance and that there was prejudice as a result." <u>Richter</u>, 562 U.S. at ––––, 131 S. Ct. at 787.  To establish deficient performance, "a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'"  <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct. at 2064).  Further, "[a] court considering a claim of ineffective assistance must apply 'a strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.  <u>Id.</u>  Thus, "[e]ven under <u>de novo</u> review, the standard for judging counsel's representation is a most deferential one." <u>Id.</u> at ––––, 131 S. Ct. at 788.

As a result, "[e]stablishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult." <u>Richter</u>, 562 U.S. at ––-,131 S. Ct. at 788.  "Where the highly deferential standards mandated by <u>Strickland</u> and AEDPA both apply, they combine to produce a doubly deferential form of review that asks only 'whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.'" <u>Gissendaner v. Seabolt</u>, No.12-13569, –– F.3d ––, ––, 2013 WL 6086032, at *10 (11th Cir. Nov. 19, 2013) (quoting <u>Richter</u>, 562 U.S. at ––,131 S. Ct. at 788).  "This 'double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court

is found to merit relief in a federal habeas proceeding.'" Id. (quoting Evans v. Sec'y, DOC, FL, 699 F.3d 1249, 1268 (11th Cir. 2012)).

## IV. BRADY CLAIM

In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963). The prosecution has a duty to disclose favorable evidence even absent a request by the defendant. United States v. Augurs, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399 (1976).

To prove a Brady violation, a defendant must establish three elements: (1) the evidence at issue is "favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) this favorable evidence was "suppressed by the State, either willfully or inadvertently"; and (3) the defendant suffered prejudice as a result. Allen v. Sec'y, Fla. Dep't of Corr., 611 F.3d 740, 745-46 (11th Cir. 2010) (internal quotation marks omitted). To establish prejudice (also referred to as materiality), a defendant must demonstrate "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. at 746 (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985)). "A 'reasonable probability' is a probability

35

sufficient to undermine confidence in the outcome." Parker v. Allen, 565 F.3d 1258, 1277 (11th Cir. 2009) (internal quotation marks omitted).

## A.    The 3.850 Court Reasonably Concluded that the State Was Not Aware of Exculpatory Information Before Downs's Trial.

The essence of the exculpatory information is Barfield's statement to his cellmate Murray that Johnson told Barfield that he (Johnson) killed Harris. Because the state 3.850 court found that the State was unaware of this evidence before the guilt phase of the trial, Downs cannot show suppression—the second Brady element. See id. ("The prosecution does not . . . have an obligation to seek evidence of which it has no knowledge or which is not in its possession."); United States v. Cravero, 545 F.2d 406, 420 (5th Cir. 1977) ("The purpose of Brady is to assure that the accused will not be denied access to exculpatory evidence known to the government but unknown to him." (emphasis added));[7] see also Dist. Att'y Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 68, 129 S. Ct. 2308, 2319-20 (2009) (stating that, according to Brady, "due process requires a prosecutor to disclose material exculpatory evidence to the defendant before trial," and "nothing in our precedents suggest[s] that this disclosure obligation continue[s] after the defendant was convicted and the case was closed" (emphasis added)).

_____

[7]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981

36

In denying Downs's <u>Brady</u> claim after an evidentiary hearing, the 3.850 court expressly found that the "only time that law enforcement heard that Barfield was saying that Johnson was the triggerman was January 9, 1978 . . . <u>after</u> [Downs's] trial." This factual finding is supported by the evidence before the 3.850 court. The first intelligible recording of Barfield's conversation with Murray occurred on January 9, 1978, after the guilt phase of Downs's trial. The record contains no recordings or notes of any conversations between Murray and Barfield before January 9, 1978. The only evidence of conversations before January 9, 1978 comes from the testimonies of Spaulding and Murray at the 3.850 hearing.

At the 3.850 hearing, Detective Spaulding testified that he was not aware of Johnson's statement to Barfield (that Johnson killed Harris) until January 9, 1978. We recognize that Murray testified that he relayed this information to Spaulding before Downs's trial. The 3.850 court, however, was free to credit Spaulding's testimony over Murray's. Similarly, although Detective Spaulding stated that Murray told him in October of 1977 that Barfield "had told [Murray] all about the murder," the 3.850 court was free to believe Detective Spaulding's testimony that Murray at that time "didn't go into detail" about who committed the murder. <u>See Consalvo v. Sec'y for Dep't of Corrs.</u>, 664 F.3d 842, 845 (11th Cir. 2011) (stating that "questions about the credibility and demeanor of a witness" are "questions of fact," and federal courts "have no license to redetermine credibility of witnesses

37

whose demeanor has been observed by the state trial court, but not by them"

(internal quotation marks omitted)).

The 3.850 court therefore reasonably found that Spaulding did not learn

about Johnson's statement to Barfield (that Johnson killed Harris) until January 9,

1978.  And because January 9, 1978 was after the guilt phase of Downs's trial, this

information could not have been suppressed in violation of Brady as to the guilt

phase.  See Osborne, 557 U.S. at 68, 129 S. Ct. at 2319-20; Cravero, 545 F.2d at

420. [8]

## B.    The 3.850 Court Reasonably Concluded that Downs Was Aware of Johnson's Statements

There is a second reason Downs cannot show suppression.  Unlike the State,

Downs himself was aware of Johnson's statements to Barfield before his

(Downs's) trial.  See Parker, 565 F.3d at 1277 (stating that there is no suppression

of evidence under Brady "if the defendant knew of the [exculpatory] information

or had equal access to obtaining it"); see also Cravero, 545 F.2d at 420 ("The

purpose of Brady is to assure that the accused will not be denied access to

---

[8]Although Downs's first "final" sentencing hearing was on January 27, 1978, after Barfield's January 9, 1978 statement, Downs already received a new sentencing hearing in 1989, where a second jury again recommended a death sentence.  In this appeal, Downs's Brady claim asserts that Johnson's statement to Barfield, as told by Murray, would have been useful during the guilt/innocence phase of Downs's trial.

exculpatory evidence known to the government but <u>unknown to him</u>." (emphasis added)).

At the 3.850 hearing, Downs testified that he was present when, prior to his trial, Johnson said to Barfield that he (Johnson) killed Harris.  Thus, Downs could have fully used this information to his advantage at trial.  For example, he could have cross-examined Johnson about his admission to Barfield, or could have called Barfield to testify about Johnson's statements (assuming that Barfield's testimony would have been admissible).  Because Downs himself was aware of the allegedly exculpatory information before his trial, no <u>Brady</u> violation occurred in this case. See <u>Parker</u>, 565 F.3d at 1277; <u>Cravero</u>, 545 F.2d at 420.

## C.    The 3.850 Court's Factual Finding Forecloses Downs's Argument that Murray's Information Could Have Been Used to Impeach Detective Spaulding

Downs contends that it was not just Johnson's statement to Barfield that was exculpatory, but also the fact that Barfield relayed Johnson's admission to Murray, and Murray relayed the information to Detective Spaulding.  Downs argues that this information could have been used to impeach Spaulding's testimony at trial and undermine the State's credibility.  This argument fails.

As discussed above, the 3.850 court found that Spaulding did not know about Johnson's admission until the January 9, 1978 tape recording, a factual finding supported by evidence.  See 28 U.S.C. § 2254(d).  Given that Detective

39

Spalding did not learn of this information until after Downs's trial, it could not have been used to impeach Spalding at Downs's trial.

## D.    The Mere Existence of Murray

Downs also argues that even though he was present and already knew what Johnson told Barfield, the State of Florida still violated Brady by not disclosing to Downs the "existence of Murray, a government informant residing in the same cell as co-defendant John Barfield." This argument also fails.

Although Detective Spaulding indeed knew of Murray's existence before Downs's trial, Downs does not cite to any authority holding that the mere existence of a person constitutes Brady information. Brady applies only when withheld information is "favorable to the accused, either because it is exculpatory, or because it is impeaching." Allen, 611 F.3d at 745-46 (internal quotation marks omitted). As the Eighth Circuit has explained, the "mere identity of witnesses is not exculpatory and is not covered by Brady." United States v. Boyce, 564 F.3d 911, 918 (8th Cir. 2009).

Instead, the existence of informants or potential witnesses constitutes Brady material only when the informant or potential witness would offer or lead to exculpatory or impeaching information favorable to the defendant. Compare, e.g., United States v. Streit, 962 F.2d 894, 900 (9th Cir. 1992) (disclosure of witnesses' identities was not required "because they were not witnesses to the crime and were

40

not involved in the criminal enterprise in any way."), with Monroe v. Angelone, 323 F.3d 286, 300 (4th Cir. 2003) (identities of witnesses who had observed a suspicious vehicle speeding away from the murder scene were favorable to the defendant and thus covered by Brady); Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 829–31 (10th Cir. 1996) (police report containing information about the true identity of a key witness, who actually may have committed the crime but testified at trial under a false name, was favorable information under Brady); United States v. McCullah, 745 F.2d 350, 353 (6th Cir. 1984) (indicating that the identity of a government witness may have been favorable to the defendant where the witness's existence lent some support to the defendant's story because the witness corroborated that he met the defendant at a certain time and place); see also Roviaro v. United States, 353 U.S. 53, 64-65, 77 S. Ct. 623, 630 (1957) (concluding that the government could not withhold the identity of an undercover informer where the informer was the sole participant with the defendant in a drug deal and the informer was "the only witness in a position to amplify or contradict the testimony of government witnesses."); cf. Banks v. Dretke, 540 U.S. 668, 691, 124 S. Ct. 1256, 1272 (2004) (Brady applies where government failed to disclose that a key witness at trial was a paid police informant).

Here, Downs points only to the existence of Murray as a jailhouse informant. He does little to explain how the existence of Murray, by itself, was

41

favorable to Downs or would have led him to favorable evidence. As discussed above, Detective Spaulding testified that before Downs's trial Murray did not go into detail as to what Barfield said about what happened on the night of the Harris murder. Before January 9, 1978, Detective Spaulding obtained no information from Murray that was favorable to Downs. The existence of Murray did not implicate Brady before Downs's trial.

Downs argues that had he known about Murray's existence before trial, Murray could have led him to favorable evidence. More specifically, Downs contends that his counsel could have interviewed Murray before his trial and thus his counsel would have learned that Barfield told Murray that Johnson had stated he killed Harris. But Downs did not need Murray for this information; at the time of his trial, Downs himself was already aware of Johnson's statement to Barfield because Downs was there when Johnson allegedly made it.

Downs also suggests that interviewing Murray before his trial "may have led to additional evidence regarding other statements by Barfield relating to the Harris killing." This Court "cannot speculate as what evidence the defense might have found if the information had been disclosed," Williamson v. Moore, 221 F.3d 1177, 1183 (11th Cir. 2000) (internal quotation marks omitted), and Downs's only example of such additional evidence is "that Barfield told Murray in October 1977 that he was plotting to kill Mr. Downs." It is difficult to see how this information

42

would have been favorable to Downs's defense. If anything, this shows that Barfield knew he had hired Downs and wanted to keep Downs from testifying against Barfield.

Downs cannot avoid that neither Murray nor Barfield actually witnessed the murder. Downs cannot avoid that Murray had no knowledge about the murder independent of what he heard from Barfield. Downs cannot avoid that he already knew that Barfield had information about the murder from Johnson; in fact, Downs was there when Johnson told Barfield about the murder. Under these circumstances, we cannot say that the mere existence of Murray as a jailhouse informant constituted Brady material before Downs's trial. Much less can we say that the Florida courts' rejection of Downs's argument was contrary to clearly established Supreme Court precedent. See § 2254(d). Indeed, Downs has cited to no case from any court holding that the existence of a jailhouse informant under similar facts would implicate Brady.

In light of the foregoing, we conclude that Downs's federal habeas petition falls far short of establishing that the 3.850 court's ruling on the Brady issue "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at —-, 131 S. Ct. at 786-87. Downs's § 2254 petition therefore cannot overcome AEDPA's "formidable barrier to federal habeas

43

relief for prisoners whose claims have been adjudicated in state court." Titlow, —

U.S. at —, 134 S. Ct. at 16.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Downs argues that counsel Brown rendered ineffective assistance by failing

to call three defense witnesses: himself (Downs), Perry, and Michael.  To prove

ineffective assistance of counsel for failure to call witnesses, a defendant must

show both that (1) counsel performed deficiently, and (2) the deficient

performance prejudiced the defense.  Strickland, 466 U.S. at 687, 104 S. Ct. at

2064.  For the reasons stated below, we conclude that the Florida Supreme Court

reasonably found no deficient performance under Strickland, and, therefore, we

need not reach the question of prejudice.  See id. at 697, 104 S. Ct. at 2069

("[T]here is no reason for a court deciding an ineffective assistance claim to . . .

address both components of the inquiry if the defendant makes an insufficient

showing on one.").

To establish deficient performance, a defendant must show that his counsel's

representation "fell below an objective standard of reasonableness" under

"prevailing professional norms."  Id. at 688, 104 S. Ct. at 2064-65.  The test for

reasonableness is whether, "in light of all the circumstances," counsel's conduct

fell "outside the wide range of professionally competent assistance."  Id. at 690,

104 S. Ct. at 2066.  "[A] court deciding an actual ineffectiveness claim must judge

44

the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id.

"Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689, 104 S. Ct. at 2065. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91, 104 S. Ct. at 2066.

## A.    Brown's Decision Not to Call Downs

At the 3.850 hearing, Brown presented two main reasons for not calling Downs as a witness. First, Brown believed that Downs was at least present during the shooting of Harris, and, if Downs told this truth on the witness stand, the jury would have convicted him of first-degree murder. As Brown explained, "it wasn't a defense to the first degree murder charge that [Downs] wasn't actually the person who fired the shot."[9] Second, Brown did not want Downs to perjure himself on the stand by testifying that he was not present at the scene of the shooting. These reasons for not wanting Downs to testify were reasonable. Certainly, counsel's refusal to suborn perjury does not constitute deficient performance. See Scott v.

---

[9]Downs does not challenge on appeal Brown's assessment of Florida law at the time of trial.

45

Dugger, 891 F.2d 800, 803 (11th Cir. 1989) ("[A]ppellant's lawyer could not have rendered ineffective assistance by failing or refusing to present a false defense.").

Downs argues that Brown's justification for not having him testify is not supported by the record because (1) Brown did not tell Downs that he would not be testifying until the brief pause following the closing of the State's case-in-chief; (2) even during this brief pause, Brown did not tell Downs that perjury was the reason why Downs should not testify; and (3) Brown's belief that Downs would perjure himself was entirely unjustified. Downs's arguments fail.

First, according to Brown's testimony at the 3.850 hearing, Brown had numerous discussions with Downs about the possibility of his testifying. Moreover, Brown testified that he had explained to Downs why he should not take the stand. Specifically, Brown told Downs that "he couldn't get on the stand and incriminate himself, that he couldn't get on the stand and commit perjury; [and] that if he attempted to tell a false story on the witness stand the jury would more than likely see through it." Brown testified that Downs eventually "acquiesced in [Brown's] decision not to put him on the witness stand."[10]

Second, Brown's explanations for why he thought Downs was at the scene of the murder were reasonable. Brown testified that Downs pointed out

---

[10]As discussed above, we must presume that the Florida courts correctly credited Brown's testimony over that of Downs. See 28 U.S.C. § 2254(d)(2); Consalvo, 664 F.3d at 845.

inaccuracies in Harris's autopsy report,[11] told Brown how Johnson threw the murder weapon off a bridge, and also told Brown how he (Downs) and Johnson disposed of the dirty clothing worn during the shooting. Although, in retrospect, these communications from Downs did not necessarily place him at the scene of the shooting, and were consistent with Downs's version of the facts, it was reasonable for Brown to believe that Downs's intimate knowledge of how the crime occurred evidenced his presence at the scene and involvement in the murder.

Furthermore, the 3.850 court found that "[t]here was no mention of alibi by [Downs's] relatives nor [Downs] until shortly before trial," and Downs does not challenge this finding. That Downs waited so long to tell Brown that he was at Michael's house during the shooting cast serious doubt on this alibi defense, and further supported Brown's belief that Downs was, in fact, present at the murder and would commit perjury by testifying otherwise.

As the Supreme Court cautioned, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S.

---

[11]Although Downs contradicted Brown's testimony, the Florida courts were free to believe Brown over Downs. And even if the autopsy report matter did not alone justify Brown's belief that Downs was at the scene of the crime, there were other reasons justifying this belief, as discussed below.

at 689, 104 S. Ct. at 2065. Given all the circumstances, we cannot say that Brown's decision not to call Downs fell "outside the wide range of professionally competent assistance." Id. at 690, 104 S. Ct. at 2066.

**B.    Brown's Decision Not to Call Perry and Michael**

As to his sister Perry, Downs contends that Brown should have called her as a witness because she would have testified that Johnson, who was her lover at the time, told her that he (Johnson) killed Harris.

The 3.850 court found that Brown interviewed Perry in August of 1977. After interviewing Perry extensively, Brown concluded that if asked the "same question three times," Perry would give "three different versions of what she had heard or seen or so forth." The 3.850 court also found that during her deposition on December 5, 1977, Perry "testified that she did not have information where [Downs] was and that no one told her where he was." Brown was afraid that Perry could be "completely impeached" at trial.

Brown also feared that Perry's testimony would place Downs at the murder scene. At one point, Perry told Brown in an interview that Johnson said to Perry that he (Johnson) and Downs "were at the scene of the homicide. Mr. Downs had the gun in his hand but froze up. [Johnson] took the gun from Mr. Downs'[sic] hand and killed Harris." Indeed, Perry never said in the many versions of her story that Downs was not at the scene or that Downs "was elsewhere."

48

As to his grandmother Michael, Downs contends that Brown should have called her as a witness because she would have told the jury that Downs was at her house the night of the Harris murder. The 3.850 court found that Brown interviewed Michael in August of 1977 and that Michael made no mention of this alibi at that time. The 3.850 court also found that Michael gave a sworn deposition on December 7, 1977 during which Michael "denied knowing where [Downs] was at the time of the murder."

Michael offered the alibi for the first time shortly before trial. When Brown questioned her about this, Michael could not answer or substantiate any of the details regarding the alibi. Although Michael could have testified at trial that Downs was with her on the night of the murder, Brown reasonably believed that this alibi was false.

At the 3.850 hearing, Brown testified that he discussed with Downs the value of both Perry and Michael as witnesses. Downs did not insist that Brown call either Perry or Michael. Brown further testified that, by not presenting defense witnesses, he retained the right to begin and end the closing arguments. Brown explained that this right "became more and more important" to the defense in light of the testimony presented by the State. Brown weighed presenting the testimony of Perry or Michael "versus losing the right to open and close, [and] there was no

49

contest as far as [he] was concerned." Brown's decision to sacrifice essentially valueless testimony to preserve opening and closing arguments was reasonable.

Again, although Brown's strategy not to call Perry or Michael turned out to be unsuccessful, and may have been erroneous in hindsight, we cannot say that this strategy was unreasonable under the then-prevailing professional norms. See Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Much less can we say that the Florida court applied Strickland unreasonably in determining that Brown's performance was not deficient. See 28 U.S.C. § 2254(d).

## VI. CONTINGENCY FEE CLAIM

Before getting to the merits of Downs's contingency-fee claim, we must determine what standard governs this claim. Downs contends that his claim is governed by the Supreme Court's decision in Cuyler v. Sullivan, 446 U.S. 335, 100 S. Ct. 1708 (1980), which held that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." Id. at 349-50, 100 S. Ct. at 1719. Downs argues that the Florida state courts unreasonably applied Sullivan in denying his contingency-fee claim.

Sullivan dealt with a conflict of interest in the context of counsel's concurrent representation of multiple defendants. See id. at 337-38, 100 S. Ct. at 1712-13. The Supreme Court later explained, in dicta, that Sullivan does not

expressly apply to counsel's personal conflicts of interests outside the multiple representation context. Mickens v. Taylor, 535 U.S. 162, 174-75, 122 S. Ct. 1237, 1245 (2002) (stating that, although Courts of Appeals have applied Sullivan "unblinkingly to all kinds of alleged attorney ethical conflicts," including "when representation of the defendant somehow implicates counsel's personal or financial interests," the "language of Sullivan itself does not clearly establish, or indeed even support, such expansive application" (internal quotation marks omitted)); Schwab v. Crosby, 451 F.3d 1308, 1325 (11th Cir. 2006) ("[T]he Supreme Court's analysis in Mickens of whether its Sullivan rule applies to conflict of interest situations other than the one involved in the Sullivan case . . . is dicta.").

Although the Mickens observation was dicta, this Court has expressly agreed with Mickens, stating: "there is no Supreme Court decision holding that any kind of presumed prejudice rule applies outside the multiple representation context. The Sullivan decision itself did not involve any other context." Id. at 1327.

Because it was far from clearly established that Sullivan applied to Downs's contingency fee claim, the Florida Supreme Court's decision denying that claim could not have been "contrary to, or involved an unreasonable application of," Sullivan. See 28 U.S.C. § 2254(d)(1). But even if Sullivan's principles applied in the contingency-fee context, Downs's claim still fails. To show a constitutional violation under Sullivan, a defendant must demonstrate that (1) his counsel labored

51

under an actual conflict of interest, and (2) this conflict "adversely affected" counsel's performance.  Sullivan, 446 U.S. at 348, 100 S. Ct. at 1718; Reynolds v. Chapman, 253 F.3d 1337, 1342 (11th Cir. 2001).  To show adverse effect, a defendant need not show that, but for the conflict of interest, the outcome of the proceeding would have been different.  See Reynolds, 253 F.3d at 1347.  Rather, a defendant "merely must demonstrate that his attorney's conflict of interest had an effect upon the representation that he received."  Id.

Assuming, without deciding, that Downs established an actual conflict of interest, he still failed to show adverse effect.  Downs contends that the contingency fee adversely affected Brown's representation by causing Brown not to present any defense witnesses.  However, at the 3.850 hearing, Brown testified that the contingency fee arrangement did not affect his representation of Downs in any way or at any time, and that he did not consider the possible $10,000 bonus in making strategic decisions during the trial.  Brown stated that, very early in his representation, he gave up "all hope of receiving that $10,000 and even the minimum fee of $5,000."  And Brown realized early on that "it would take a miracle to get Mr. Downs acquitted of all felony charges."

Brown's testimony established that the contingency fee agreement played no role in guiding his decision to not present any defense witnesses.  The state 3.850 court found, and the Florida Supreme Court affirmed, that Downs had failed to

52

show that the contingency fee affected Brown's representation of Downs. Accordingly, even if <u>Sullivan</u> clearly governed Downs's claim, the Florida courts did not unreasonably apply <u>Sullivan</u> in finding that Downs failed to establish an adverse effect from the contingency fee agreement.  <u>See</u> <u>Sullivan</u>, 446 U.S. at 348, 100 S. Ct. at 1718.  Thus, we must affirm the district court's denial of § 2254 relief with regard to this claim.

## VII. CONCLUSION

For all these reasons, we affirm the district court's denial of Downs's § 2254 habeas petition.

**AFFIRMED.**